Filed 5/21/20

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re E.E. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>K.L.,<br><br>    Defendant and Appellant. | E073284<br><br>(Super.Ct.Nos. J280083, J280084, J280085 & J280086)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County. Erin K. Alexander, Judge. Affirmed.

Dennis Temko, under appointment by the Court of Appeal, for Defendant and Appellant.

Michelle D. Blakemore, County Counsel and Jamila Bayati, Deputy County Counsel, for Plaintiff and Respondent.

1

K.L. (mother) and J.P. (father) have three young children together as well as an infant son named E. Mother tested positive for amphetamine at a prenatal visit for E., and when the child was born a few months later, he tested positive for amphetamine and marijuana. At the jurisdiction and disposition hearing, the juvenile court declared all four children dependents (Welf. & Inst. Code, § 300, subd. (b)) and removed them from the parents' care (§ 361, subd. (b)(1); unlabeled statutory citations refer to the Welfare and Institutions Code).

In this appeal, mother challenges the sufficiency of the evidence supporting all of the court's findings and orders, except the jurisdictional finding for E. She argues there was insufficient evidence E.'s siblings were at risk of harm, as well as insufficient evidence all of the children could not live safely with father, with her out of the home. We conclude substantial evidence supports the challenged findings and orders, and therefore affirm.

## I

## FACTS

A. *Detention*

In December 2018, respondent San Bernardino County Children and Family Services (CFS) received a referral alleging that mother's newborn, E., had tested positive for amphetamine and marijuana at birth and that mother had tested positive for amphetamine during a prenatal visit a few months earlier. Mother and father have three other children, J.J. (who was two years old at the time), V. (six), and J. (ten).

2

CFS made several unsuccessful attempts to contact the family in person, by phone, and by mail. Because the family had a prior history with CFS, the social worker was able to determine the elementary school J. and V. attended and made an unannounced visit to interview them.[1] J. and V. said they felt safe in the home and their basic needs were being met. They said they slept on an inflatable mattress in the living room or in their relative's room when he was traveling. They said E. didn't have a crib and slept on blankets on the floor, next to their parents. They were able to give an age-appropriate definition of drugs and alcohol and denied their parents used either.

On February 5, 2019, the social worker interviewed the parents at the apartment in Rialto where they then lived. In his separate interview, father said his family had moved into the apartment a few months earlier. He said mother hadn't told him why CFS was investigating his family, and he denied she used any drugs. He said she used to smoke marijuana but had stopped and had never used the drug while pregnant. He said he had also quit smoking marijuana before his oldest child, J., was born. He said he had been arrested for DUI in 2013 and had not completed his alcohol abuse classes. The social worker searched his criminal history and confirmed the DUI (he had been convicted of the charge in 2015), and also found weapons-related charges from 2006 and 2007 (specifically, carrying a dagger and manufacture or import of an undetectable firearm).

---

[1] CFS had received a general neglect and physical abuse referral regarding the family in 2014 and a general neglect and emotional abuse referral in 2018. Both cases were closed as unfounded or inconclusive.

In her separate interview, mother said father *did know* E. had tested positive for drugs at birth. She said she uses marijuana for pain management because she injured her legs in a car accident. She said she had only used marijuana once while she was pregnant with E. because the pain had become unbearable. She denied using amphetamines. She claimed she had gone to a party a few days before E. was born and accidentally drank from a cup that wasn't hers. The liquid had made her feel "very weird," but she didn't go to the hospital because she was scared. She became upset when the social worker asked her about the other positive amphetamine test from the prenatal visit. She said she had been "going through a rough time" back then, and nobody had told her they would be drug testing during the visit. She denied having a substance abuse problem. She also denied co-sleeping with E., explaining he slept on a mattress on the floor and she slept on the floor next to him.

Both parents agreed to drug test, and the social worker informed them that missed tests would be considered positive. Later that day (February 5), mother called the social worker "audibly hysterical" and said she hadn't known it was going to be an observed drug test. She said she "could not pee in front of somebody" and complained that the testing staff had made her "feel like a bad mother." The test results reflected she had attempted to urinate twice but had a "shy bladder" and refused to try to urinate a third time. Father's February 5 drug test was positive for amphetamine. He told the social worker he had taken Sudafed for allergies that day and requested another test. The lab ran a confirmation test on the same urine sample and it came back negative. On February 6

and 7, mother said she could not test because she wasn't in the facility's system, but the social worker checked and confirmed she was in the system and was able to test.

In late February, the social worker contacted mother to arrange another drug test. Mother said she felt harassed by CFS and said her children were fine and "not being abused." The social worker promised mother she was not trying to open a case against her but in fact was hoping to do the opposite, resolve the case without court intervention. She explained she couldn't close the family's referral, however, without a negative test from mother and a formal "Children and Family Team Meeting" (team meeting). She explained that, given the positive toxicology results for E., it was crucial and necessary to create a safety plan. Mother said she did not want her family to find out about her drug use or CFS's involvement.

The social worker followed up with mother on this issue, and this time her supervisor also participated in the phone call. The supervisor reiterated the social worker's assurances that CFS was not trying to harass mother's family. The supervisor explained that CFS management had decided a team meeting and clean drug test were needed before they could close the investigation. Ultimately, mother agreed to drug test and attend a team meeting.

But mother's decision to cooperate changed over the ensuing weeks. She did not respond to the social worker's attempts to schedule another drug test, and then, on March 4, father sent the social worker the following text: "There is no reason for a meeting. You tried and tried to find something and there wasn't anything. We've complied [with]

everything that you have asked us to do. At this point I'm feeling like this is personal. I feel like my family and my inalienable right to pursuit of happiness is being denied to us. You will have to speak to our lawyer from this point on." Father did not provide the lawyer's name or contact information. Mother then called the social worker to follow up on father's text. She said she would not agree to a team meeting or any more drug tests. She also said to contact their lawyer going forward but hung up when the social worker asked for the lawyer's contact information.

On March 6, CFS decided to file section 300 petitions on behalf of the children, due to its unresolved concerns about mother's drug use and father's refusal to acknowledge that issue or cooperate with CFS. The social worker called the parents and informed them of the upcoming detention hearing. They responded that a dependency case wasn't necessary because the children were no longer in their custody. Father said they had recently "signed their rights over" and the children had not been in their care for a week.

On March 7, CFS filed petitions alleging the children were dependents under section 300, subdivision (b) (failure to protect). The operative allegations against the parents were that: mother has a "substance use" problem that impairs her ability to provide appropriate care for her children; father reasonably should have known of mother's problem; and father has a "marijuana abuse problem," placing the children at risk.

The juvenile court held the detention hearing the following day. The parents were not present, and both CFS and counsel for the children recommended detention. The court found prima facie evidence of a substantial risk to the children's physical health and safety, ordered them detained out of the home, and set the jurisdiction and disposition hearing for April 2. On March 25, with the assistance of Rialto police, CFS detained the children in foster care.

B. *Jurisdiction and Disposition*

The social worker interviewed the parents when CFS took the children into custody. Mother said it was difficult for her to drug test because of her job. She said they had refused a team meeting back in February because they had been misadvised by a friend that such a step was not necessary if jurisdiction had not been established. Father added that by the time the social worker tried to schedule the meeting, they had already given "temporary guardianship" of the children to a family friend, a woman named Carla. The parents said they did not attend the detention hearing because, during a free consultation, an attorney had told them they didn't have to go if CFS had not given them notice of the hearing by mail. Father told the social worker that his family had gone through a rough period when mother was pregnant with E., just before they moved into the Rialto apartment. He said they had "lost their home, stayed with friends, been kicked out, and moved from motel to motel and were around people who were using substances."

Mother said she was currently using marijuana for pain management but said she only did so at night and never around the children. She maintained that she had accidentally ingested amphetamine at a party. She added that her water broke the following day and she had "informed the hospital that she did not know what she drank." Father denied mother had a drug problem and said the only substance he had ever seen her use was marijuana. Despite his earlier statement to the contrary, father admitted he still used marijuana. He said he would use it when he got off work, for work-related pain.

The social worker also interviewed Carla, the family friend and purported guardian of the children. Carla said the parents had signed a notarized document giving her guardianship on February 26, 2019, and since that time she had been caring for the children "on and off" because they were still "transitioning." She was not aware she had to go to court to become their legal guardian.

On March 26, 2019, the parents attended a team meeting with the social worker. CFS ordered random drug testing for the parents and referred them to individual counseling, parenting classes, and substance abuse treatment.

The following day, CFS filed its jurisdiction and disposition report, recommending removal of all four children and provision of family reunification services. The social worker was concerned about the parents' willingness to cooperate with CFS. She was also concerned that, despite mother's and father's positive amphetamine tests, they continued to claim marijuana was the only drug they used.

At the April 2 hearing, the court continued the jurisdiction and disposition hearing to June 17 and ordered the parties to attend mediation. The court gave CFS authority to detain the children with father, with mother out of the home, if CFS determined the parents were cooperating with the investigation. The court explained that, like the social worker, it was also concerned about the parents' willingness to cooperate with the investigation, given their behavior since the referral. The court asked if there was a request to drug test the parents that day, and counsel for the minors answered in the affirmative. The court then ordered the parents to drug test and advised them that missed tests would be considered positive tests.

We note here that the juvenile court could not order *the parents* to submit to drug testing at this stage in the proceedings. Before jurisdiction is established through a finding that a minor is a person described by section 300, a juvenile court's authority to issue orders against a parent is limited and does not include the power to issue an order like the one here, compelling a parent to drug test. (See *In re Jody R.* (1990) 218 Cal.App.3d 1615, 1622-1623; §§ 319, 323.) If a juvenile court determines that drug testing is warranted before jurisdiction, section 319 gives the court authority to order *the social services agency* to provide testing referrals. (See § 319, subd. (e) ["If a court orders a child detained, the court shall . . . order services *to be provided* as soon as possible to reunify the child and his or her family if appropriate"], italics added.) Section 319 does not, however, authorize the court to order the parents to make use of those referrals. In most cases, the distinction—that is, whether the court orders the agency to provide drug

testing or the parent to submit to drug testing—will have no practical impact on the case. Here, however, the point is not just an academic one. It is relevant to our analysis in response to CFS's contention that we should dismiss mother's appeal under the disentitlement doctrine because (among other things) she violated the court's order to drug test. We discuss this issue more fully, below.

Turning back to the facts of this case, on May 22, the social worker met with the parents. Father was living with a relative who had a "significant criminal history." He had not participated in any services and claimed he had not been referred for services. The social worker checked and confirmed that both parents had in fact been referred for services two months earlier. Father's drug testing record was inconsistent. He had missed three tests (April 2, May 6, and June 12), had two negative tests (May 17 and June 6), and tested positive for marijuana on April 1. Mother's testing record was also inconsistent. She had missed two tests (April 1 and May 14), tested negative on three occasions (May 24, April 17, and April 10), and tested positive for marijuana on April 2. Father remained in denial about mother's history of drug use and maintained her ingestion of amphetamine just before E. was born was accidental.

On June 5, CFS moved the children from their foster home to the home of a relative who had recently been cleared for placement.

On June 17, the court continued the jurisdiction and disposition hearing one month to give CFS the opportunity to assess the parents' progress in services and consider the possibility of letting father move in with the relative caretaker. Mother's counsel

10

informed the court that mother was now living in Los Angeles and had filed a change of address. Counsel also lodged exhibits with the court consisting of various character references from the parents' friends and relatives and J.'s school records reflecting he was doing very well academically.

The parents told a CFS social worker that they were fully engaged in all services, but this turned out not to be true. The social worker assigned to their case learned that, as of July 10, mother had participated in only one session of a drug treatment program. She had tested negative three times since the last hearing. Father had been dropped from a drug treatment program twice, for failure to attend. He had been called to test only once since the last hearing, and the results were still pending. The parents had not participated in any parenting classes or individual therapy.

CFS was unable to recommend letting father move in with the caretaker because it was concerned about her ability to protect the children from father's potential drug problem. The caretaker had lived with the family when E. was born and had denied noticing any substance issues when CFS began its investigation. She assured the social worker that she would be protective now that she was aware of the issue, but the social worker doubted her ability to recognize if father was using.

The jurisdiction and disposition hearing took place on July 18, 2019. Father filed a waiver of rights form (JV-190), submitting on CFS's reports and waiving his right to a contested hearing on jurisdiction. He did, however, contest CFS's disposition recommendation, arguing the children could safely live with him while he received

11

family maintenance services. Mother contested the jurisdiction allegations against her, and the court and parties accepted the following offer of proof from her attorney: "Mother would testify that even with the positive drug test [for E.] the three older children were well cared for and did well in school and her argument is about nexus." Her counsel argued the positive amphetamine tests were remote and there was currently no substantial risk of danger or harm to the children. As to disposition, mother contested removal from father and represented she would be willing to "move anywhere" if the court allowed the children to live with him.

The court sustained the jurisdiction allegations against the parents. Addressing mother's nexus argument, it stated: "[T]his was not just a one-time positive test at birth . . . the mother also tested positive at a prenatal visit. [¶] After that the agency made attempts to alleviate risk by working with the family. The family avoided all contact with CFS, minimized all of the risks involved, refused to set up a CFT or a safety plan and generally was noncooperative with the agency. [¶] Since that time the parents have had over six months in which to engage in services and there likely could have been a return at today's date. [¶] However, they failed to consistently engage in services, continued to miss tests . . . [and] failed to recognize why [drug use in the home] presents a risk to young children including an infant."

Moving to disposition, the court found clear and convincing evidence that the children could not safely be returned to either parent's care. As to father, the court found he failed to acknowledge or recognize any issues with mother's drug use, to cooperate

with CFS, or to make progress on his case plan. "[W]e've given a number of months for the parents to show that they're going to cooperate with the agency. . . . [¶] . . . [¶] At [the beginning of the case] the father was largely uncooperative with the agency. . . . [T]he parents hid the children by doing a nonbinding guardianship . . . refused to meet or have a CFT which led to the original detention. [¶] Since that time the Court has also given additional time, indicated a willingness to consider either returning to the father on his own or in the home of the relative [but] . . . [¶] [f]ather continues to minimize the concerns of [CFS], indicates [he] doesn't recognize the issues related to the mother's drug use, has his own missed test. And once enrolled in a program, which took almost four months to get enrolled in, only showed up twice." The court ordered the children to remain in the care of the relative they were currently living with. It also ordered family reunification services for the parents, with two-hour supervised visits at least three times a week.

Mother filed a timely notice of appeal.

## II

## ANALYSIS

Mother challenges the sufficiency of the evidence supporting all the court's jurisdictional and dispositional findings and orders except for its exercise of jurisdiction over E. For the reasons we explain below, we find no error.

A.   *Applicable Law and Standard of Review*

"'A dependency proceeding under section 300 is essentially a bifurcated proceeding.' [Citation.] First, the court must determine whether the minor is within any of the descriptions set out in section 300 and therefore subject to its jurisdiction." (*In re Stephen W.* (1990) 221 Cal.App.3d 629, 645.) Section 300, subdivision (b)(1), authorizes a juvenile court to exercise dependency jurisdiction over a child if the "child has suffered, *or there is a substantial risk that the child will suffer*, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child." (Italics added.) "A jurisdictional finding under section 300, subdivision (b)(1), requires [the agency] to demonstrate the following three elements by a preponderance of the evidence: (1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re L.W.* (2019) 32 Cal.App.5th 840, 848 (*L.W.*), citing *In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561; *In re R.T.* (2017) 3 Cal.5th 622, 624.)

Second, if the court exercises jurisdiction over the minor, it must decide the appropriate disposition. Generally, the court chooses between allowing the child to remain in the home with protective services in place and removing the child from the home while the parent engages in services to facilitate reunification. "Removal from parental custody at disposition may be ordered where a return home would pose a substantial danger to the child's physical health and where there are no reasonable alternatives to removal. (§ 361, subd. (b)(1).)" (*In re Stephen W.*, *supra*, 221 Cal.App.3d

14

at p. 645.) The burden of proof for jurisdictional findings is preponderance of the evidence; for removal, it is clear and convincing evidence. (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248.)

"'In reviewing the jurisdictional findings and the disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.'" (*In re R.T.*, *supra*, 3 Cal.5th at p. 633.) The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or orders. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

### B. *The Disentitlement Doctrine Does Not Apply*

Preliminarily, we address CFS's argument that we should decline to reach the merits of mother's substantial evidence challenge and dismiss her appeal under the disentitlement doctrine. CFS argues that if mother had been "honest, cooperated with pre-detention services, [and] did not stonewall CFS, [or] play crafty games [like] establishing a non-binding guardianship to hide the children pre-detention," the section 300 petition "would have been unnecessary." According to CFS, we should dismiss mother's appeal because she resisted reform and "defi[ed] . . . court orders" during the six months leading up to the jurisdiction and disposition hearing. CFS misunderstands the disentitlement doctrine. In the dependency context, the doctrine is not a punishment for failing to

cooperate with the social services agency but rather for violating court orders in such a way that prevents the court from protecting the child.

The disentitlement doctrine, or appellate disentitlement, refers to a reviewing court's "inherent power to dismiss an appeal by a party who has refused to comply with the orders of the trial court." (*People v. Puluc-Sique* (2010) 182 Cal.App.4th 894, 897.) It "is not a jurisdictional doctrine, but a discretionary tool that may be applied when the balance of the equitable concerns make it a proper sanction." (*Ibid.*) In the criminal context, the doctrine applies when the appellant is a fugitive from justice. (*Ibid.*) "Appellate disentitlement is, fundamentally, a doctrine based on forfeiture: a defendant who escapes or otherwise flees the authorities gives up the right to challenge a conviction or sentence while refusing to abide by its consequences." (*Id.* at p. 898.)

The doctrine has also been applied in the civil context, for example, when a party's violation of a court order frustrates the other party's ability to protect their legal rights. (E.g., *TMS, Inc. v. Aihara* (1999) 71 Cal.App.4th 377, 379-380 [dismissing judgment debtors' appeal because they refused to comply with court order to answer postjudgment interrogatories]; *Tobin v. Casaus* (1954) 128 Cal.App.2d 588 [conditionally dismissing appeal from a money judgment because appellant refused to appear at a judgment debtor's examination and to surrender in response to an arrest warrant].) Courts imposing the disentitlement refer to it as the "ultimate sanction" for violating court orders. (E.g., *Deyo v. Kilbourne* (1978) 84 Cal.App.3d 771, 787; *Guardianship of Melissa W.* (2002) 96 Cal.App.4th 1293, 1299.)

16

As the California Supreme Court explained in *MacPherson v. MacPherson* (1939) 13 Cal.2d 271, the only case where our high court has applied the doctrine in the parent-child context, dismissing a party's appeal is an extreme measure that deprives a party of their right to "ask the aid and assistance of [the] court." (*Id.* at p. 277.) *MacPherson* involved a divorce proceeding. During the pendency of that proceeding, after the court had awarded custody of the children to the mother, the father absconded with the children and refused to reveal their whereabouts. The trial court ultimately issued orders requiring the father to, among other things, immediately return the children to mother's custody and pay the attorney fees, expenses, and costs she incurred in trying to locate the children. (*Id.* at p. 276.) When the father appealed the fees and costs portion of the judgment, the California Supreme Court dismissed his challenge, reasoning that by "secluding the children in a foreign country and alienating them, [he] violated not only his agreement with [the mother] and the provisions of the interlocutory and final decrees of divorce, but he has also wilfully and purposely *evaded legal processes* and contumaciously defied and nullified every attempt to *enforce the judgments and orders of the California courts*, including the very order from which he seeks relief by this appeal." (*Ibid.*, italics added.) The Court concluded the father had "effectually bar[red] him[self] from receiving the assistance of an appellate tribunal" by engaging in "[s]uch flagrant disobedience and contempt." (*Ibid.*)

In dependency cases, the interest at stake for a parent is "enormous." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 223; see also *In re B.G.* (1974) 11 Cal.3d 679, 688; *In re*

17

*K.C.* (2011) 52 Cal.4th 231, 236 [the interest of a parent in the "companionship, care, custody, and management" of their children is a "compelling one, ranked among the most basic of civil rights"].) As a result, appellate courts have rarely applied the disentitlement doctrine to dismiss a parent's appeal. To illustrate, the court applied the doctrine *In re Kamelia S.* (2000) 82 Cal.App.4th 1224 to a father who, after appealing the order placing his daughter in foster care, "abduct[ed]" his daughter and could not be found. (*Id.* at p. 1227.) Similarly, in *In re E.M.* (2012) 204 Cal.App.4th 467, the court applied the doctrine to dismiss the mother's appeal of the jurisdictional findings because she "willfully left the jurisdiction with her children while the petition was pending" and after the court issued protective custody warrants for the children. (*Id.* at pp. 469, 471.) Application of the doctrine in those cases was not only fair, but also practical. By fleeing with their children to a different jurisdiction while their cases were pending, the parents violated custody or placement orders regarding their children, thereby making it impossible for the court to safeguard the children's best interests. When a parent's violation of a juvenile court's orders makes the most crucial aspect of that court's job impossible, it stands to reason they should not be able to ask a reviewing court to overturn the juvenile court's orders.

This is obviously not such a case. All of the conduct CFS cites as grounds for the disentitlement doctrine occurred before the court took jurisdiction over the children. Indeed, most of the conduct occurred before the court had even detained the children, while CFS was investigating the referral. This timing distinction is important when determining whether appellate disentitlement is an appropriate sanction.

18

As we discussed above, before the juvenile court takes jurisdiction over a child by finding them to be a person described by section 300, the court may not order a parent to cooperate with the social services agency, engage in services, or submit to alcohol or drug testing. "The juvenile court is a special department of the superior court whose powers are limited to those granted by the Juvenile Court Law." (*In re Ashley M.* (2003) 114 Cal.App.4th 1, 6 (*Ashley M.*), citing § 200 et seq.) The dependency statutes authorize the juvenile court "to make orders pertaining to abused or neglected children who come within the court's jurisdiction. (§§ 361, 362.)" (*Ashley M.*, at p. 7.) "Authorization for the juvenile court to order *participation in* child welfare and reunification services is set forth in sections 361.2, 361.5, and 362." (*In re Jody R.*, *supra*, 218 Cal.App.3d at p. 1625, italics added.) Those sections govern the court's power to make dispositional orders *after* jurisdiction has been established.

Section 319, which sets forth the juvenile court's authority during an initial or detention hearing, provides that if the court orders a child detained, it "shall . . . order services *to be provided* as soon as possible to reunify the child and his or her family if appropriate." (§ 319, subd. (e), italics added.) Such an order does not compel *the parent* to participate in services, rather it compels *the social services agency* to make services available to the parent. "'The juvenile law system envisions a cooperative effort between the [social services agency] and the juvenile court.' [Citation.] The social services agency has the initial responsibility to investigate allegations of abuse or neglect and has authority to take temporary custody of an abused or neglected child. (§ 306.) But the

19

agency must account to the court on the reasons for removing the child from home and on the services available to facilitate the child's return. (§ 319.)" (*Ashley M.*, *supra*, 114 Cal.App.4th at p. 7.) "In providing child welfare services, the county's social services agency acts as an administrative agency of the executive branch . . . ." (*Ibid.*)

In short, before jurisdiction, the court can issue orders detaining the child and orders directing the social services agency to provide services, but it cannot order or otherwise compel the parent to cooperate with the agency. A parent's participation in services, whether before jurisdiction and disposition or after, is always voluntary. (See *In re Nolan W.* (2009) 45 Cal.4th 1217, 1233 ["it is not the court's role to force a parent to participate in services . . . "'[r]eunification services are voluntary, and cannot be forced on an unwilling or indifferent parent.""") The same is true regarding a parent's participation in the social service agency's investigation to determine whether to file a section 300 petition.

That's not to say there are no consequences for failing to cooperate in the investigation or participate in services. One consequence is that those failures "can be used later as evidence in a review hearing or a hearing on a [section 300] petition." (Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2017) § 2.44, p. 2-97, citing Welf. & Inst. Code, § 16501.1, subd. (g)(12)(B).) Additional consequences include the loss of reunification services and the most serious consequence of all, loss of parental rights. (*In re Nolan W.*, *supra*, 45 Cal.4th at pp. 1235-1236 [the dependency statutes "repeatedly make clear" that "the punishment for noncompliance with reunification

20

services [is] . . . loss of those services and, ultimately, loss of parental rights"].) But because parents are under no legal obligation to cooperate with the social services agency, we see nothing equitable about adding appellate disentitlement to those consequences.

Our colleagues in the Second District concluded similarly in *In re Baby Boy M.* (2006) 141 Cal.App.4th 588 (*Baby Boy M*). The mother in that case, "while under the jurisdiction of the juvenile court because of the dependency proceedings involving her other children, willfully impeded the ability of the court and the Department to protect Baby Boy M. by delivering the child to his biological father to take to an unknown location, recognizing that, if she kept the baby, the Department would immediately take custody of him." (*Id*. at p. 597.) The court rejected the department's request to extend the disentitlement doctrine to the mother's pre-jurisdiction conduct. The court explained that while it did not condone her obstructive behavior, she "had no legal obligation" to discuss the birth of her newborn with the department. (*Ibid.*) The court concluded that although she "may have impeded the Department's efforts to help her family and frustrated the underlying purpose of the dependency law," appellate disentitlement was unjustified because she had not violated a court order and therefore did not "'stand[ ] in an attitude of contempt to legal orders and processes of the courts of this state.'" (*Ibid.*)

Similarly here, and contrary to CFS's characterization, mother's conduct of giving her children to a family friend during the investigation and failing to consistently drug test or engage meaningfully in services violated no court order. At that stage in the

21

proceedings, the only order she could have violated was the court's order placing her children in foster care. Had she taken her children from foster care and fled, appellate disentitlement would be an appropriate sanction. (Cf. *In re Kamelia S.*, *supra*, 82 Cal.App.4th at p. 1227; *In re E.M.*, *supra*, 204 Cal.App.4th at p. 471.) But she did not. Instead, she was uncooperative during the investigation. Thus, like the *Baby Boy M.* court, we also "decline to expand the disentitlement doctrine to preclude the appeal of a recalcitrant parent, who, despite her initial lack of cooperation, *has violated no court order*." (*Baby Boy M.*, *supra*, 141 Cal.App.4th at pp. 597-598, italics added.)

CFS's reliance on *In re C.C.* (2003) 111 Cal.App.4th 76 (*C.C.*), a prior opinion from this court, is unhelpful. In *C.C.*, the mother avoided participating in a prejurisdictional psychological evaluation and, as a result, the juvenile court could not determine at the dispositional hearing whether she had a mental disability that rendered her "incapable of utilizing reunification services" within the meaning of section 361.5, subdivision (b)(2). (*C.C.*, at p. 85.) The juvenile court ordered reunification services for mother, believing it had no authority to deny services without such evidence. (*Id.* at pp. 80, 82.) The minor appealed, and we reversed and remanded, directing the juvenile court to *order* the mother to submit to a psychological evaluation (as opposed to merely authorizing an evaluation, prejurisdiction). (*Id.* at p. 92.) Though the issue was not before us, we advised that *if* the mother refused to submit to the *court-ordered* evaluation, the juvenile court would be justified in using the disentitlement doctrine to deny reunification services on remand. (*Id.* at p. 85.) We used broad language, staking out the position that

where "the parent is not cooperative, a court has the inherent power under the disentitlement doctrine to bar that parent from seeking further assistance from the court, including the provision of reunification services." (*Ibid.*)

We don't think *C.C.* provides a basis for applying the disentitlement doctrine here. First, the case did not involve *appellate* disentitlement, but more fundamentally, our discussion of the doctrine was only dicta. (*C.C.*, *supra*, 111 Cal.App.4th at p. 92 [noting that "it remains to be seen whether the court will order an evaluation and whether Mother will cooperate"].) In addition, we question the appropriateness of *C.C.'s* broad pronouncement regarding the doctrine's application. The Legislature has created a meticulous statutory scheme *requiring* the provision of reunification services unless specific statutorily mandated findings are made based on clear and convincing evidence. (§ 361.5, subds. (a) & (b).) We are not aware of any other published case holding that a parent may be denied reunification services based solely on the disentitlement doctrine, and we doubt the discretionary doctrine creates a sweeping power to deny reunification services in view of the Legislature's clear preference for keeping families together at the disposition stage. (See *In re Nolan W.*, *supra*, 45 Cal.4th at p. 1228 [explaining "'[f]amily preservation, with the attendant reunification plan and reunification services, is the first priority when child dependency proceedings are commenced'" and "'[r]eunification services implement "the law's strong preference for maintaining the family relationships if at all possible"'"].)

23

Although CFS did not rely on this case in its brief, we note that in *In re A.K.* (2016) 246 Cal.App.4th 281 (*A.K.*) this court applied the disentitlement doctrine in circumstances similar to, though more egregious than, this case. In *A.K.*, the father had been extremely defiant toward the social worker during the agency's investigation and failed to submit to court-ordered drug tests before the jurisdiction and disposition hearing. (*Id.* at p. 284; see also *id.* at p. 286 [concluding the father "possessed 'an attitude of contempt to legal orders'"].) While we share the sentiments of the *Baby Boy M.* court that defiant or obstructive behavior during the investigation stage is not to be condoned, we believe the appropriate consequence for such behavior is that it will reflect poorly on the parent when the juvenile court and later the appellate court assess the merits of their case. The father in *A.K.* had violated no court order. As in our case, the court ordered drug testing after detention, but, as we explained above, that order compelled the social services agency to provide testing referrals, it did not compel the father to submit to testing. Thus, the father's failure to drug test under those circumstances cannot serve as a basis for applying appellate disentitlement. We therefore decline to follow *A.K.'s* holding that a parent who is defiant towards the social services agency but has not violated a court order or prevented the court from protecting the child can be disentitled to their right to appeal.

Appellate disentitlement should not be used as a tool for punishing parents who do not fully cooperate with the social services agency during the investigation stage leading up to jurisdiction. In our view, the dependency statutes provide appropriate and adequate

consequences for such behavior. Disentitlement should be reserved for those cases where the parent's violation of court orders makes it impossible for the juvenile court to protect the child's best interests. (E.g., *In re Kamelia S.*, *supra*, 82 Cal.App.4th at p. 1227; *In re E.M.*, *supra*, 204 Cal.App.4th at p. 471.) The kind of defiant behavior or failure to engage in services that might support removal from parental custody at disposition—such as failing to cooperate with the social services agency, being less than forthcoming during interviews, or missing drug tests—does not also warrant the ultimate sanction of appellate disentitlement.

Because mother's lack of cooperation and obstructive tactics did not rise to the level of absconding with her children or engaging in conduct that would similarly prevent the court from protecting her children's best interests, we will proceed to the merits of her appeal.

C.      *Jurisdiction*

Mother argues neither her nor father's conduct supports a finding that E.'s siblings fall within the court's dependency jurisdiction. As we will explain, we conclude substantial evidence supports the juvenile court's decision to find the siblings dependents based on mother's conduct. As a result of this conclusion, we need not review the evidentiary basis for the sustained allegations against father. (See *In re I.A.* (2011) 201 Cal.App.4th 1484, 1491-1492 [minors are dependents "if the actions of *either* parent

bring [them] within one of the statutory definitions of a dependent"].) In other words, the court properly exercised jurisdiction over E.'s siblings regardless of father's conduct.[2]

Conceding the court has jurisdiction over E. due to the positive drug tests during his gestation and birth, mother argues there was no evidence that his older siblings had been harmed or were at risk of harm at the time of the hearing. She contends there is no evidence she is a substance *abuser* and argues her past use of drugs is an insufficient reason to assert jurisdiction over E.'s siblings. We are not persuaded.

"[S]ection 300 does not require that a child actually be . . . neglected before the juvenile court can assume jurisdiction. The subdivisions at issue here require only a 'substantial risk' that the child will be . . . neglected. The legislatively declared purpose of these provisions 'is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, *and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm*.' (§ 300.2, italics added.) 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

"The Legislature has declared, 'The provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child.' (§ 300.2.)" (*L.W.*, *supra*, 32

---

[2] Our conclusion makes it unnecessary to address CFS's argument that mother lacks standing to challenge the evidentiary basis for the sustained jurisdictional allegations against father.

Cal.App.5th at p. 849.) "On the other hand, our case law stands for the proposition that drug use or substance abuse, *without more*, is an insufficient ground to assert jurisdiction in dependency proceedings under section 300." (*Ibid.*, italics added.)

Emphasizing that E.'s siblings were in good health and doing well in her care, mother argues her case falls under the substance use "without more" category. Given our standard of review, we reject this argument on the ground the juvenile court could reasonably draw a different conclusion from the evidence. First of all, mother's past use of drugs was serious in and of itself. As the court aptly reasoned during the hearing, mother's past drug use was reckless and occurred on more than one occasion—she used drugs three times that we know of during her pregnancy. And, while a big part of this case is the drug use that we know about, that's not the only facet of mother's behavior that could give the juvenile court cause for concern over the children's safety.

The record reveals that in addition to using drugs while pregnant, she was also evasive and resisted investigation and help from CFS. Not long after the agency learned of E.'s positive toxicology, mother refused to speak with the social worker and tried to hide her children by temporarily giving them to a friend to care for. The record also supports a conclusion that she has been dishonest about the extent of her drug use. She never actually admitted using amphetamine while pregnant and consistently maintained an implausible story of accidental ingestion to explain the second positive amphetamine test. In addition, she initially refused a team meeting because she wanted to keep the positive toxicology results from her family, which could be interpreted as a sign that

27

avoiding detection was more important to her than addressing the issue and developing a plan to keep her children safe.

The record also supports a conclusion that mother has been resistant to treatment and monitoring. She avoided or missed several drug tests and, at the time of the hearing, had not seriously begun any services to address her issues. Finally, mother's drug use coupled with father's admission that, while she was pregnant with E., the family had been staying with people who were using substances reasonably supports an inference that mother minimizes or does not appreciate the potential dangers to children caused by being around drug use.

Mother's attempt to analogize this case to *In re L.C.* (2019) 38 Cal.App.5th 646 is unpersuasive. In that case, the legal guardian of L.C. (who by all accounts was healthy and doing well) admitted to having used methamphetamine six or seven times. He said that on each occasion he had stayed in a hotel and arranged for child care so he would not be around L.C. while he was under the influence. (*Id.* at p. 650.) Initially, the guardian had denied using methamphetamine, but once he learned he could lose custody of L.C., he admitted having used, began consistently testing on his own initiative (even before the agency enrolled him in random drug testing), and promptly enrolled in substance abuse treatment. (*Ibid.*) The obvious and significant difference between *L.C.* and this case is that mother had the poor judgment to use while she was pregnant and then failed to take the proactive monitoring and treatment steps that L.C.'s guardian took.

We find this case more like *In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1217, where the appellate court affirmed the juvenile court's determination that the mother's four children were persons described by section 300, subdivision (b)(1). At birth, the mother's youngest child tested positive for cocaine, amphetamine, and methamphetamine, but she denied having used cocaine while pregnant. (*Christopher R.*, at p. 1213.) She conceded jurisdiction was proper as to her youngest because the child "was born with a positive toxicology screen for cocaine and other illicit drugs," but argued that "the evidence of her sporadic drug use was insufficient to support the findings she was a current substance abuser and [that her other three children] were at substantial risk of serious physical harm justifying the exercise of the juvenile court's jurisdiction." (*Id.* at p. 1215.) The appellate court rejected this argument, reasoning the juvenile court was free to disbelieve the mother's claim of sporadic drug use, based on her conduct during the case. "[The mother] used cocaine (and, based on the positive toxicology screen for [the infant] at birth, amphetamine and methamphetamine) while she was pregnant, unquestionably endangering the health and safety of her unborn child. She also admitted she had used cocaine in the past although claiming she had stopped using when she was 17 years old. Given her initial false denial of any cocaine use in the days before [her youngest] was born, the juvenile court reasonably disbelieved [her] portrayal of limited, sporadic drug use. . . . This evidence, taken together with [her] unstable lifestyle and cavalier attitude toward childcare . . . fully supports the juvenile court's [jurisdictional] finding." (*Id.* at p. 1217.)

29

Similarly here, given mother's implausible denial of the extent of her drug use while pregnant, her evasive behavior, and her resistance to monitoring and services, the juvenile court could reasonably disbelieve her offer of proof that she was no longer using. We conclude the record contains substantial evidence to support a finding that, at the time of the hearing, E.'s siblings were at risk of suffering serious harm as the result of neglect on mother's part.[3]

D.    *Disposition*

Mother also challenges the evidentiary basis for removing all of the children from her and father's care.

We start with the order removing the children from mother. At the time of the jurisdiction and disposition hearing, she had moved to Los Angeles and was no longer living with father. She did not provide any details about her new residence or ask the court to place the children with her. Instead, her counsel said he "underst[oo]d the Court has a legal basis for removal from [mother] based on the Court's [jurisdictional] findings," and argued the court could safely place the children with father and provide family reunification services for mother. In other words, mother provided the court with no basis to conclude it could safely return the children to her custody. She had not made any meaningful progress in services and the court knew nothing of her new home

_____

**[3]** Mother spends much of her brief challenging the idea that her family's living and sleeping arrangements supported jurisdiction. For example, she argues the sole fact that E.'s siblings sometimes slept on an inflatable mattress did not make their home unsafe. We agree. But as we explained, it is the circumstances surrounding her drug use that have created the danger of harm for her children, not the state of her former apartment.

environment. For those reasons alone, we conclude the court's decision to remove the children from mother was supported by substantial evidence.

As to the order removing the children from father, mother argues the only potentially negative evidence regarding his parenting abilities was his single positive test for amphetamine, which he claimed was caused by taking Sudafed the day of the test and which came back negative after a confirmation test.[4] Again, a reasonable trier of fact could interpret the evidence differently.

During the six months between the referral and the jurisdiction and disposition hearing, father denied mother had a drug problem (despite learning of E.'s positive toxicology at birth), sent the social worker a recalcitrant text message demanding she leave his family alone, attempted to give the children to a family friend during the investigation, tested positive for marijuana, missed a number of tests, made no progress in services, and moved in with a relative who had a significant criminal history. Based on this evidence, the juvenile court could reasonably infer that father lived in an environment unsuitable for children, would not cooperate with CFS (to the point of willful obstruction), would not protect his children from mother's drug problem, and possibly had a drug problem of his own. These inferences support a conclusion that the children could not safely be returned to his custody.

---

[4] We reject CFS's contention that mother lacks standing to challenge the disposition order as to father. Mother has standing because the children's placement in out-of-home care "has the potential to adversely affect [her] own interests in reunifying with [them]." (*In re R.V.* (2012) 208 Cal.App.4th 837, 848-849.)

31

Mother argues this case is identical to *In re Hailey T.* (2012) 212 Cal.App.4th 139, 146 (*Hailey T.*), where the appellate court affirmed the jurisdictional findings but reversed the removal order as to one of the parents' children. In that case, the parents had a four-month-old son and a three-year-old daughter, Hailey. One day after the maternal grandmother had been watching the children, the mother noticed the son was crying and one of his eyes was red. (*Id.* at p. 142.) The parents took the child to a doctor who concluded he had a subconjunctival hemorrhage that was inflicted by nonaccidental means. (*Ibid.*) Neither parent was able to explain the child's injury other than to posit that Hailey might have hurt him when she was combing his hair or playing with his toys. (*Ibid.*) The parents had been married for nine years and had no prior child welfare history, and the social worker believed they appeared to be good parents. (*Id.* at p. 143.) Hailey said no one fought or yelled in the home. After the agency detained the children, the parents started attending weekly parenting courses, individual counseling, and a 52-week child abuse class, and they visited the children daily and helped with their basic care. (*Id.* at p. 144.) The court took jurisdiction over both children and ordered removal from the parents because the identity of the perpetrator was unknown and the children were so young. (*Id.* at p. 145.)

The appellate court reversed the removal order as to Hailey, explaining that past abuse of a sibling does not, on its own, justify removing a child from their parents. The court found that the risk to Hailey of any future abuse was "strikingly less" than the risk facing her infant brother. (*Hailey T.*, *supra*, 212 Cal.App.4th at p. 147.) "Hailey was not

32

an infant of only a few months old, who would be unable to articulate any abuse to which she might be subjected, and who would be completely isolated from the observations of mandated reporters of abuse. By the time of the disposition hearing, Hailey was a four-year-old child, with good language skills and an outgoing and social nature. She attended school where she had regular contact with teachers and other mandated reporters of any suspected abuse." (*Ibid.*) The court also found significant the fact that there was "abundant evidence" that the parents were good parents who enjoyed a healthy relationship. "[T]here was no evidence of *any* physical domestic violence between the parents during their nine-year marriage. Neither parent had substance abuse problems, and there was no evidence that either suffered from mental health conditions, developmental delays or other social issues that often are at the root of dependency cases and might place children at continuing risk in the home. [They] were parents who started services at the earliest opportunity, showed progress in the services and had meaningful and productive visits with the children. Even Agency participants in a team decision meeting early on in the case recognized [the mother and the father] were good parents." (*Id.* at pp. 147-148.)

We find that case easily distinguishable from this one. Unlike the parents in *Hailey T.*, mother and father did not cooperate with the social worker or engage meaningfully in services when CFS became involved with their family. To the contrary, they were emphatically resistant to the agency's investigation, demanding the social worker leave them alone and trying to avoid further investigation by giving their children to a family

33

friend. Over the ensuing six months, they became only slightly more cooperative by appearing at hearings and submitting to some drug tests. But on the whole, their resistant behavior and lack of progress in services reflect a desire to avoid investigation into the extent of their drug use and a lack of insight into the serious problems parental drug use poses.

"The trial court is in the best position to determine the degree to which a child is at risk based on an assessment of all the relevant factors in each case." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 766.) On this record, we cannot agree with mother that there was an insufficient evidentiary basis to remove the children from her and father.

As a final point, we address an incorrect argument CFS makes in its briefing that appears to have stemmed from a rise in appellate opinions misinterpreting section 361, subdivision (c)(1) and the burden of proof required to justify removal from a parent's custody. Citing *In re R.V.*, *supra*, 208 Cal.App.4th 837, CFS asserts that the "jurisdiction findings constitute prima face evidence supporting a juvenile court's finding a child cannot safely remain in the home." The Welfare and Institutions Code does contain a statutory presumption in favor of removal, but that presumption applies only to a narrow class of cases—those where the child has been adjudicated a dependent under section 300, subdivision (e) (severe physical abuse of a minor under five years old).

As a general rule, the required burden of proof is clear and convincing evidence. Section 361 provides that a juvenile court must not remove a child from parental custody "unless [it] finds clear and convincing evidence of any of the following circumstances

34

listed in paragraphs (1) to (5)," which include the circumstance where "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . custody." (§ 361, subds. (c) & (c)(1).) "'The elevated burden of proof for removal from the home . . . reflects the Legislature's recognition of the rights of parents to the care, custody and management of their children, and further reflects an effort to keep children in their homes where it is safe to do so. [Citations.] By requiring clear and convincing evidence of the risk of substantial harm to the child if returned home and the lack of reasonable means short of removal to protect the child's safety, section 361, subdivision (c) demonstrates the 'bias of the controlling statute is on family preservation, not removal.'" (*In re A.R.* (2015) 235 Cal.App.4th 1102, 1115.)

Section 361 provides a single exception to the general rule: "The fact that a minor has been adjudicated a dependent child of the court pursuant to *subdivision (e) of Section 300* shall constitute prima facie evidence that the minor cannot be safely left in the physical custody of the parent." (§ 361, subd. (c)(1), italics added.) Section 300, subdivision (e) applies when the court has found that "the child is under the age of five years and has suffered *severe physical abuse* by a parent, or by any person known by the parent, if the parent knew or reasonably should have known" of the abuse. Thus, the Welfare and Institutions Code establishes a rebuttable presumption that removal is

35

necessary in a narrow subset of cases—those where a young child has been severely physically abused and the parent was either the perpetrator of the abuse or unreasonably failed to protect the child from the abuse. In those cases, the fact the court adjudicated the child a dependent under section 300, subdivision (e) serves as prima facie evidence that the child faces a substantial risk of physical harm in the parent's custody and there are no reasonable means to protect the child short of removal. For all other cases, however, the general rule applies and the juvenile court must find clear and convincing evidence to justify removal. (§ 361, subd. (c).)

*R.V.* is one of the earliest opinions to say the statutory presumption applies in a case where the child had not been adjudicated a dependent under a section 300, subdivision (e). (See also *In re Cole C.* (2009) 174 Cal.App.4th 900, 917 (*Cole C.*) [presumption applied even though child was adjudicated a dependent under § 300, subd. (j) based on the father's excessive discipline of the child's older stepsiblings].) The child in *R.V.* had been adjudicated a dependent under section 300, subdivision (j) based on the father's sexual abuse of an older sister. The appellate court stated the jurisdictional findings against father were "prima facie evidence the child cannot safely remain in the home." (*R.V.*, *supra*, 208 Cal.App.4th at p. 849.) The court's only citation to support this proposition was section 361, subdivision (c)(1), which, as just explained, limits the statutory presumption to section 300, subdivision (e). (*Ibid.*)

After *Cole C.* and *R.V.*, other appellate courts followed suit, similarly overlooking the limitation on the presumption. (E.g., *Hailey T.*, *supra*, 212 Cal.App.4th at p. 146

36

[presumption applied even though child was adjudicated a dependent under § 300, subd. (a)]; *In re John M.* (2012) 212 Cal.App.4th 1117, 1126 [same, in a § 300, subd. (b) case]; *In re T.V.* (2013) 217 Cal.App.4th 126, 135 [same]; *In re A.E.* (2014) 228 Cal.App.4th 820, 825 [same, in a § 300, subds. (a) & (b) case]; *In re J.S.* (2014) 228 Cal.App.4th 1483, 1492 [same, in a § 300, subd. (b) case]; *In re A.F.* (2016) 3 Cal.App.5th 283, 289, 292 [same].) The recent trend in misreading section 361, subdivision (c)(1) is not without real consequences. Applying the presumption to all dependency cases effectively "deprives parents of appellate review of removal if there was a sufficient evidentiary basis for jurisdiction." (*In re G.C.* (Apr. 24, 2020, E072514) __Cal.App.5th __ [2020 Cal.App.Lexis 336, *42] (dis. opn. of Menetrez, J.) ["If jurisdictional findings always constitute prima facie evidence that the children cannot safely remain in the home, then whenever there is substantial evidence to support the jurisdictional findings, the removal findings and orders must be affirmed as well"].)

At least one published case, *In re K.S.* (2016) 244 Cal.App.4th 327 (*K.S.*), has rejected the argument that the statutory presumption applies at every disposition hearing. (See *Id.* at p. 342 ["The Agency argues that jurisdiction findings are prima facie evidence that a child cannot safely remain in a parent's care under section 361, subdivision (c)(1). But that prima facie finding only applies to a jurisdiction finding under section 300, subdivision (e) that a child under five years old has been physically abused"].) We agree with *K.S.* The statutory presumption in favor of removal applies only when the child has been adjudicated a dependent under section 300, subdivision (e).

## III

## DISPOSITION

We affirm the juvenile court's jurisdictional and dispositional findings and orders.

CERTIFIED FOR PUBLICATION

SLOUGH

Acting P. J.

We concur:


FIELDS

J.


MENETREZ

J.