3 Cal.Rptr.3d 354 (2003)
111 Cal.App.4th 76
In re C.C., a Person Coming Under the Juvenile Court Law.
Riverside County Department of Public Social Services, Plaintiff and Respondent,
v.
B.C., Defendant and Respondent;
C.C., Appellant.
No. E032112.
Court of Appeal, Fourth District, Division Two.
August 8, 2003.
Rehearing Denied September 5, 2003.
Review Denied October 22, 2003.
*355 Kathleen Murphy Mallinger, under appointment by the Court of Appeal, for Appellant.
Willaim C. Katzenstein, County Counsel, and Julie A. Koons, Deputy County Counsel, for Plaintiff and Respondent.
Jennifer Mack, under appointment by the Court of Appeal, and Richard Pfeiffer for Defendant and Respondent.

OPINION
RICHLI J.
C.C., a minor girl (Minor), appeals from the juvenile court's dispositional order granting reunification services to her mother, B.C. (Mother). Despite evidence that Mother's mental illness might make her incapable of reunifying with Minor, the court concluded it had no authority to deny services, because Mother would not submit to a psychological evaluation as required for denial of services under Welfare and Institutions Code section 361.5, subdivision (b)(2).
We conclude a juvenile court has the authority to deny services to a parent who refuses to comply with a valid court order for a psychological evaluation. We reverse the order granting services and remand to give the court and parties an opportunity to determine how they wish to proceed in light of our decision.

I

FACTUAL AND PROCEDURAL BACKGROUND

A. Dependency Petition and Detention Hearing

Minor was born in January 1999. In March 2002, the Riverside County Department of Public Social Services (DPSS) filed a dependency petition regarding Minor. The petition alleged Mother had inflicted serious physical harm on Minor, causing a nosebleed and a bruise to her forehead; Mother was mentally ill and unable to protect Minor; and Minor's father could not be located and provided no support for Minor. The petition included a police report showing that Mother had been arrested for corporal injury to a child (Pen.Code, § 273d) for causing the injuries to Minor.
DPSS's report for the detention hearing stated that at the time Mother was arrested, a police officer stated she was incoherent and unable to be interviewed. A maternal aunt who was at the scene said the family had been trying to get Mother some mental health help for a long time, to no avail. According to the aunt, Mother said things that did not make sense. Mother had been trying to prevent relatives from touching Minor because she thought this would kill Minor. Mother also had been saying that "[t]he demons [were] coming" and that she was trying to protect her daughter. Mother referred to the relatives and to herself as "dead."
The day after the petition was filed, the court ordered Minor removed from Mother's custody. It also authorized a psychological evaluation of Mother, to be confidential, and ordered reunification services and visitation for Mother.

*356 B. Jurisdictional Hearing

The court set a jurisdictional hearing for April 2002. DPSS's report for the hearing stated Mother had been released on bail after her arrest but had been returned to custody when she failed to appear for a settlement conference in March 2002. When the social worker interviewed Mother at the jail in April 2002, Mother had a "disconnected" look on her face. She stated, "I am tired of these devil games." She also said, "You can't believe anything Breanna says, she is dead." When the social worker asked her who Breanna was, Mother got a disconnected look on her face and said she did not want to talk anymore.
Mother's mother told the social worker that Mother was depressed and acted like she was "schizophrenic." She said Mother was "not in her right state of mind."
The social worker also spoke with Minor's shelter parents. The shelter mother reported that Minor had said, "[M]y mom slapped me." Later, Minor told the social worker, "[M]y mommy does not like me."
The court continued the jurisdictional hearing to May 2002 for receipt of psychological reports. DPSS requested two psychological evaluations of Mother. However, a question arose whether the evaluations could be performed without Mother's agreement.
In May 2002, DPSS requested a further continuance to obtain the results of a psychological examination of Mother. The court again continued the hearing, to June 2002. It also appointed a guardian ad litem for Mother.
DPSS's report for the June jurisdictional hearing recommended Mother receive reunification services. However, DPSS reported Mother was refusing to receive psychological services and had refused to complete psychological evaluations. A doctor had reported that Mother refused to leave her cell and refused to speak with him.
In June 2002, the court set the jurisdictional hearing as a contested matter for July 2002. At the July hearing, the court found true all of the jurisdictional allegations of the petition, including the allegation that Mother suffered from mental health problems that endangered Minor's safety and well-being.

C. Dispositional Hearing

Following the jurisdictional findings, the court conducted a dispositional hearing. It granted custody of Minor to DPSS, for placement in a foster home, relative home, or suitable facility. The court ordered no reunification services to Minor's alleged father, whom DPSS had never been able to locate.
Counsel for Minor argued the court should deny services to Mother as well, pending her participation in a psychological evaluation. All parties had stipulated Mother had continuously refused to submit to an evaluation. Counsel argued that, if a psychological evaluation showed Mother's mental illness made her unable to benefit from reunification services, the court could deny services pursuant to Welfare and Institutions Code section 361.5, subdivision (b)(2) (hereafter section 361.5(b)(2).) Mother should not be allowed to benefit from her refusal to cooperate by receiving services to which she might not be entitled.
Counsel for DPSS stated DPSS wished it could join in counsel for Minor's argument, but it could not because there was no provision in the statutes for denying services to Mother based on her refusal to be evaluated. Therefore, DPSS recommended services be granted to Mother.
The court ruled: "[T]he Court does not feel that it has the jurisdiction to take the *357 leap of finding that mother's failure to comply with the court ordered testing renders her incapable of benefiting from reunification services in this matter.... Although a person has not cooperated in participating in the evaluation where the court ordered such an assessment to be made, the [Legislature has not given us the tools to jump to the next level from finding that the person is incapable. [¶] ... [¶] ... This is possibly an area where the [Legislature should act and indicate that the Court can make such an inference based on the parent's failure to participate in the examination, but I think lacking the underlying facts for the Court to make a factual finding that 361.5(b)(1) [sic] exists by clear and convincing evidence, I just don't think the court can go there, and therefore, services are offered to the mother."

II

DISCUSSION

A. Denial of Reunification Services Under Section 361.5(b)(2)
Welfare and Institutions Code section 361.5, subdivision (a) provides that whenever a child is removed from a parent's custody, the juvenile court shall order reunification services for the parents "[e]xcept as provided in subdivision (b)...." Subdivision (b) of section 361.5 provides that services need not be provided when the court finds, by clear and convincing evidence, that any of 15 enumerated circumstances is true.
We are concerned in this case with section 361.5(b)(2), which states that services need not be provided where "the parent or guardian is suffering from a mental disability that is described in Chapter 2 (commencing with Section 7820) of Part 4 of Division 12 of the Family Code and that renders him or her incapable of utilizing those services."[1]
Family Code section 7827 is part of the chapter of the Family Code referred to in Welfare and Institutions Code section 361.5(b)(2). Section 7827 provides that a proceeding may be brought, outside of the dependency context, to free a child from parental custody and control where the parent or parents "are mentally disabled and are likely to remain so in the foreseeable future." (§ 7827, subd. (b).) Section 7827 defines "mentally disabled" to mean "that a parent or parents suffer a mental incapacity or disorder that renders the parent or parents unable to care for and control the child adequately." (Id., subd. (a).)
Family Code section 7827, subdivision (c) requires that a finding of mental disability be supported by "the evidence of any two experts," each of whom must be a psychiatrist or psychologist meeting educational and experience requirements. Welfare and Institutions Code section 361.5(b)(2) does not expressly state that it incorporates the requirement of two expert opinions. However, courts have found that it does. (See, e.g., In re Joy M. (2002) 99 Cal.App.4th 11, 18, 120 Cal. Rptr.2d 714; Linda B. v. Superior Court *358 (2001) 92 Cal.App.4th 150, 152-153, 111 Cal.Rptr.2d 559; Curtis F. v. Superior Court (2000) 80 Cal.App.4th 470, 474, 95 Cal.Rptr.2d 232.)
Thus it can be seen that Mother's refusal to submit to a psychological evaluation placed the court in an untenable position: it could not, without evaluations from two experts, find Mother was suffering from a mental disability as described in Family Code section 7827, subdivision (c). Therefore, it could not, under Welfare and Institutions Code section 361.5(b)(2), find she was incapable of utilizing reunification services and deny services to her on that basis. The court accordingly believed it was bound to offer services to Mother, notwithstanding the evidence suggesting denial of services under section 361.5(b)(2) might be shown to be appropriate if a psychological evaluation were obtained.

B. Disentitlement Doctrine

In MacPherson v. MacPherson (1939) 13 Cal.2d 271, 89 P.2d 382, a father removed his children from California to Mexico in violation of a divorce decree. His former wife obtained a judgment requiring him to pay her attorney fees and costs incurred in trying to locate the children. The Supreme Court held the father's violation of the divorce decree precluded him from appealing from the judgment awarding fees and costs, stating: "A party to an action cannot, with right or reason, ask the aid and assistance of a court in hearing his demands while he stands in an attitude of contempt to legal orders and processes of the courts of this state. [Citations.]" (Id. at p. 277, 89 P.2d 382.)
The principle that a court may refuse assistance to a party who fails to comply with a court order has been applied in a dependency proceeding. In In re Kamelia S. (2000) 82 Cal.App.4th 1224, 98 Cal. Rptr.2d 816, a father absconded with his daughter, a dependent child whom the juvenile court had placed in a foster home. Citing MacPherson v. MacPherson, supra, 13 Cal.2d 271, 89 P.2d 382, the court held the father was barred by the "doctrine of disentitlement" from appealing from the placement order. It found the father's conduct undermined and frustrated "the entire purpose of the dependency law" by making it virtually impossible for the court to extend its protection to the child at a completely unknown location. The father was "entirely responsible for paralyzing the court's ability to implement the procedures intended to benefit the interests of the dependent minor." (In re Kamelia S. at p. 1229, 98 Cal.Rptr.2d 816.) The court further held the father was precluded from seeking the assistance of the court even though he had not initiated the dependency proceeding that led to the order he violated. (Id. at pp. 1228-1229, 98 Cal. Rptr.2d 816; see also In re Guardianship of Melissa W. (2002) 96 Cal.App.4th 1293, 1299, 118 Cal.Rptr.2d 42 [grandparents could not appeal from denial of their guardianship petition where they had caused minor to be removed to Bahamas in violation of court order]; Adoption of Jacob C. (1994) 25 Cal.App.4th 617, 623-624, 30 Cal.Rptr.2d 591 [disentitlement doctrine barred mother who had abducted child from contesting stepmother's petition to terminate mother's parental rights to other child].)
Although the above decisions involved abduction of children, the principle they articulate extends to other kinds of conduct. In particular, it extends to conduct that, as in this case, frustrates the ability of another party to obtain information it needs to protect its own legal rights. In TMS, Inc. v. Aihara (1999) 71 Cal.App.4th 377, 83 Cal.Rptr.2d 834, judgment debtors refused to comply with a court order to *359 answer postjudgment interrogatories designed to secure information to aid in enforcement of the money judgment against them. The court dismissed their appeal from the judgment, holding it had the inherent power to do so without a judgment of contempt. (Id. at pp. 379-380, 83 Cal. Rptr.2d 834.)
Mother's refusal to participate in a psychological evaluation in this case is comparable to the conduct of the parties in the above cases, which was held to bar their right to seek the assistance of the courts. Mother's conduct makes it impossible for the court to perform its obligation to determine, pursuant to section 361.5(b)(2), whether her mental disability renders her incapable of utilizing reunification services. Mother's conduct also interferes with the legal rights of Minor. If Mother is, in fact, incapable of utilizing services, Minor is entitled to have her case proceed to the permanency planning stage without the delay of 12 months or more that must be afforded if reunification services are provided to Mother. (See Welf. & Inst.Code, § 361.5, subds. (a)(1), (f).) "While this may not seem a long period of time to an adult, it can be a lifetime to a young child." (In re Marilyn H. (1993) 5 Cal.4th 295, 310, 19 Cal.Rptr.2d 544, 851 P.2d 826.) Mother, like the offending father in Kamelia S., is "entirely responsible for paralyzing the court's ability to implement the procedures intended to benefit the interests of the dependent minor." (In re Kamelia S., supra, 82 Cal.App.4th at p. 1229, 98 Cal.Rptr.2d 816.)
The Legislature could not have intended this result when it enacted section 361.5(b)(2). The requirement of two expert evaluations incorporated into that provision implicitly assumes a cooperative parent who will submit to the evaluations. Where, as here, the parent is not cooperative, a court has the inherent power under the disentitlement doctrine to bar that parent from seeking further assistance from the court, including the provision of reunification services. The Legislature could not have intended otherwise.
Application of the disentitlement doctrine is particularly appropriate in the context of reunification services. "Reunification services are a benefit, and there is no constitutional `entitlement' to these services." (In re Joshua M. (1998) 66 Cal. App.4th 458, 476, 78 Cal.Rptr.2d 110.) If, as the decisions discussed above hold, a party can be precluded by its contumacious conduct from exercising its statutory right of appeal, the rule of preclusion should apply equally to Mother's right under Welfare and Institutions Code section 361.5, subdivision (a) to receive reunification services. Mother should not be permitted to create a classic Catch 22[2] situation in which the court must extend her services because it cannot determine whether, in fact, she is actually entitled to them.

C. Intent to Interfere

Mother argues application of the disentitlement doctrine requires a showing of mens rea, i.e., that the offending party had the specific intent to undermine, defy, or impede the court, and there was no showing she had that intent. We do not find in the decisions applying the disentitlement doctrine any such requirement. In fact, as DPSS points out, in the cases involving child abduction the offending parties' whereabouts were unknown, so their actual mental states could not be determined. And courts have repeatedly stated that application of the disentitlement doctrine is appropriate notwithstanding the fact the *360 offending party has not been found in contempt of court. (Guardianship of Melissa W., supra, 96 Cal.App.4th 1293, 1299, 118 Cal.Rptr.2d 42; TMS, Inc. v. Aihara, supra, 71 Cal.App.4th 377, 379, 83 Cal. Rptr.2d 834; see also Adoption of Jacob C., supra, 25 Cal.App.4th 617, 622, 30 Cal. Rptr.2d 591 [court noted juvenile court had not found mother in contempt, but applied disentitlement doctrine nonetheless].)
It is true that in the above cases there was no suggestion the offending parties suffered from mental disability, as there is in this case. But even where a party's mental condition is in doubt, the courts have held he or she can properly be required to submit to a psychological evaluation and to suffer adverse consequences in the event of a refusal. In Baqleh v. Superior Court (2002) 100 Cal.App.4th 478, 122 Cal.Rptr.2d 673, defense counsel raised the issue whether the defendant was competent to stand trial. The court held the trial court had the authority to order the defendant to submit to a psychiatric and/or psychological examination by prosecution experts. (Id. at p. 486, 122 Cal.Rptr.2d 673.) It further held that if the defendant refused to submit the court could impose an "issue" sanction, i.e., an order that the issues to which the examination related be taken as established in favor of the prosecution. (Id. at p. 506, 122 Cal.Rptr.2d 673; see Code Civ. Proc., §§ 2023, subd. (b)(2), 2032, subd. (f).)
In People v. Carpenter (1997) 15 Cal.4th 312, 63 Cal.Rptr.2d 1, 935 P.2d 708, after the defense presented expert testimony about the defendant's mental condition in the penalty phase of a capital prosecution, the court ordered the defendant to submit to a psychiatric examination by the prosecution's expert. The defendant refused to talk to the examiner. The court instructed the jury that if it found the defendant's refusal was willful, it could consider that when weighing the defense expert testimony. The Supreme Court held the instruction was proper, stating: "Defendant had no right to refuse to cooperate with the psychologist, so the jury could properly consider his refusal. [Citation.] The jury could properly infer that defendant wanted only his self-chosen experts, not others, to evaluate him, an inference relevant to its consideration of all the evidence of his mental condition." (Id. at p. 413, 63 Cal.Rptr.2d 1, 935 P.2d 708.)
Neither of these decisions required a finding that the defendant acted with the specific intent to impede the court before he could suffer adverse consequences for not submitting to an evaluation. The instruction approved by the court in People v. Carpenter, supra, 15 Cal.4th 312, 63 Cal.Rptr.2d 1, 935 P.2d 708 required only that the jury find the refusal was willful. "Willful" ordinarily means simply that an act is performed with the purpose or willingness to commit the act, not that the actor intended to violate the law. (Pen.Code, § 7, subd. 1; People v. Lara (1996) 44 Cal.App.4th 102, 107, 51 Cal. Rptr.2d 402.) If no more than willfulness is required where, as in Carpenter, the potential consequences of an evidentiary sanction include imposition of the death penalty, no more should be required in the present context.
We do not mean to suggest that if the court concluded Mother was incapable of submitting to a psychological evaluation, it could not take that into account in deciding what consequences should attach to her refusal. But the record before us merely indicates Mother was "refusing to receive psychological services," had "refused to complete the psychological evaluations," and "refused to leave her cell and refused to speak with" the doctor who was to evaluate her. There is no suggestion *361 Mother's condition prevented her from cooperating or that her refusal to cooperate was other than willful. Moreover, if Mother showed through competent expert evidence that she was too impaired to participate in a psychological evaluation, it would be a virtually foregone conclusion that the same expert evidence would show she was incapable of benefiting from reunification services for purposes of section 361.5(b)(2).

D. Initiation of Legal Proceedings

Mother argues the disentitlement doctrine cannot be applied against her, because unlike the appellants in the cases applying the doctrine, she did not initiate the legal proceedings in this case, but is merely a defendant in an action brought by the state against her.
There is no requirement that the disentitlement doctrine only be applied against the party who initiated the legal proceedings. In Adoption of Jacob C, supra, 25 Cal.App.4th 617, 30 Cal.Rptr.2d 591, the court applied the doctrine to preclude the mother from contesting the stepmother's petition to terminate her parental rights. It did so notwithstanding the fact the mother had not initiated the proceeding and had not sought any relief from the juvenile court. (Id. at pp. 623-624, 30 Cal.Rptr.2d 591.)
The decisions on which Mother relies do not support her position. The issue in People v. Kubby (2002) 97 Cal.App.4th 619, 118 Cal.Rptr.2d 588 was whether the disentitlement doctrine could be applied against a criminal defendant who filed a cross-appeal from his conviction and then fled the jurisdiction. The court concluded the doctrine should apply to require dismissal of the cross-appeal, because although he did not initiate the appeal, the defendant sought affirmative relief by cross-appealing. (Id. at p. 627, 118 Cal. Rptr.2d 588.)
In this case we are not concerned with whether the appeal should be dismissed, so the fact Mother did not initiate the appeal or seek affirmative relief on appeal is irrelevant. Instead, we are concerned with whether the disentitlement doctrine should be applied in the juvenile court. Adoption of Jacob C., supra, 25 Cal.App.4th 617, 30 Cal.Rptr.2d 591 indicates the disentitlement doctrine may be applied against a parent in the juvenile court even though the parent has not sought affirmative relief in that court.
Even if there were a requirement that the offending party seek affirmative relief, Mother did so by arguing she was entitled to reunification services. The statutory right to receive services is not self-executing. Rather, services must be ordered by the court. (See Welf. & Inst.Code, § 361.5, subd. (a).) Seeking services therefore brings into play the principle underlying the disentitlement doctrine, that a party who refuses to comply with the directives of the court cannot seek the assistance of the court in securing its own legal rights.
Doe v. Superior Court (1990) 222 Cal. App.3d 1406, 272 Cal.Rptr. 474 also does not support Mother's argument. In that case, the court held that a criminal defendant who fled the jurisdiction was nonetheless entitled to defend, through counsel, a civil suit brought by the crime victim against him. (Id. at p. 1411, 272 Cal.Rptr. 474.) In holding that the disentitlement doctrine did not apply, the court cited the fact that the defendant had not initiated the civil lawsuit. (Id. at p. 1409, 272 Cal. Rptr. 474.) However, it also cited the fact that the defendant's absence from the country was "unrelated to the merits of Doe's civil action. [Citation.]" The defendant had not "failed to comply with any discovery requests or otherwise interfered *362 with Doe's ability to collect evidence." (Id. at p. 1410, 272 Cal.Rptr. 474, fn. omitted.)
Here, in contrast, Mother's refusal to undergo psychological evaluation is intimately related to the merits of the dependency proceeding. Mother's refusal to be evaluated makes it impossible for the court to determine whether she should receive reunification services. Moreover, Mother's conduct plainly has interfered with Minor's and DPSS's ability to collect evidence, since without a psychological evaluation they cannot effectively argue she is not entitled to reunification services under section 361.5(b)(2). Hence, it is appropriate to apply the disentitlement doctrine against her.

E. Court's Awareness of its Authority

Mother notes the juvenile court stated when it granted her reunification services that one remedy for her refusal to submit to a psychological evaluation was for the court to exercise its contempt power. She argues that the disentitlement doctrine is an exercise of the court's contempt power, so we must presume the court was aware of the doctrine and considered and rejected its application here.
We do not share Mother's interpretation of the court's comments. As DPSS points out, the court never mentioned the disentitlement doctrine. Contrary to Mother's assertion, the doctrine is not an exercise of the court's contempt power. As discussed ante, a finding of contempt is not required for application of the doctrine. (Guardianship of Melissa W., supra, 96 Cal.App.4th 1293, 1299, 118 Cal. Rptr.2d 42; TMS, Inc. v. Aihara, supra, 71 Cal.App.4th 377, 379, 83 Cal.Rptr.2d 834; see also Adoption of Jacob C, supra, 25 Cal.App.4th 617, 622, 30 Cal.Rptr.2d 591.)
More fundamentally, it is abundantly clear from the record that the court believed it had no authority to deny Mother reunification services based on her refusal to undergo a psychological evaluation. Therefore, even if we presume the court was aware of the disentitlement doctrine, it plainly was not aware the doctrine could be applied to support denial of services. Hence, its comments cannot fairly be read as an indication it was aware of, considered, and rejected the doctrine as Mother contends.

F. Statutory Construction

Mother contends fundamental principles of statutory construction preclude this court from authorizing the denial of reunification services based on her refusal to be evaluated. In her view, section 361.5(b)(2) sets forth the exclusive basis for denying services to a mentally disordered parent, and absent the two psychological evaluations required by that section, a court lacks authority to deny services regardless of the fact it is the parent's conduct itself that prevents compliance with the statute. With due regard for the obligation of a court to refrain from intruding upon the prerogatives of the Legislature, we reject Mother's argument.
"The Legislature cannot reasonably be expected to anticipate every conceivable problem of construction that may arise when it enacts a statute." (Vittal v. Long Beach Unified Sch. Dist. (1970) 8 Cal. App.3d 112, 120, 87 Cal.Rptr. 319.) "In general, it is settled that the language of a statute should not be given a literal meaning if doing so would result in absurd consequences that the Legislature did not intend. To this extent, therefore, intent prevails over the letter of the law and the letter will be read in accordance with the spirit of the enactment. [Citation.]" (In re Michele D. (2002) 29 Cal.4th 600, 606, 128 Cal.Rptr.2d 92, 59 P.3d 164.)
*363 Where a parent refuses to consent to a psychological evaluation, giving a literal meaning to the requirement of section 361.5(b)(2) that the court grant reunification services absent two evaluations supporting denial manifestly "would result in absurd consequences that the Legislature did not intend." (In re Michele D., supra, 29 Cal.4th 600, 606, 128 Cal.Rptr.2d 92, 59 P.3d 164.) The "spirit of the enactment" (ibid.) is clear: The Legislature intended that, where a parent's mental impairment renders him or her incapable of reunifying within the time allowed by statute, the case proceed directly to the permanency planning stage so that the delay and disruption in the ultimate placement of the minor can be minimized. A parent should not be permitted to unilaterally thwart the intent of the statute by refusing to be evaluated.
Further, the Legislature plainly intended that the extent of the parent's impairment be determined by a psychological evaluation before the court decides whether to grant reunification services, so that services will not be granted where they would be ineffectual. Mother's position, that the court must grant her services pending an evaluation that may never occur because she may never consent to it, turns the legislative scheme on its head.
The disentitlement doctrine is a recognized nonstatutory doctrine of law. Courts have not hesitated to apply the doctrine to deny a party a statutory right it would otherwise enjoy. The cases discussed ante applied the doctrine to authorize dismissal of appeals notwithstanding the fact the right of appeal is guaranteed by statute, and the statutes conferring the right contain no proviso to the effect that a party may be denied the right based on failure to comply with the directives of the court. (See, e.g., Code Civ. Proc., § 902.) Neither should the fact section 361.5(b)(2) does not explicitly empower a court to deny services where a parent's behavior makes it impossible to determine whether services are warranted deprive a court of the ability to exercise that option. A contrary holding would exalt the silence of one statute, section 361.5(b)(2), over the juvenile court's overriding statutory obligation to promote the best interests of the child. (Welf. & Inst.Code, § 202, subds. (b), (d).)

G. Remedy

The remaining question is the appropriate remedy for Mother's refusal to submit to a psychological evaluation. We have concluded that a remand is necessary. Although the record reflects that the court at the detention hearing "authorized" a psychological evaluation of Mother, it does not appear the court ever ordered Mother to undergo an evaluation. Absent such an order, the disentitlement doctrine would not apply.
Moreover, a court has no authority to order a psychological evaluation of a parent until it has exercised dependency jurisdiction. "Only after a finding the child is at risk, and assumption of jurisdiction over the child, do a parent's liberty and privacy interests yield to the demonstrated need of child protection. At that stage, where the aim is to reunify parent and child, expert opinion on the cause and extent of mental illness may be required to ascertain which services will eliminate the conditions leading to dependency." (Laurie S. v. Superior Court (1994) 26 Cal.App.4th 195, 202-203, 31 Cal.Rptr.2d 506.) In contrast, "[frequently after a finding of jurisdiction a parent may be ordered to undergo an evaluation to determine if the parent is mentally disabled and if reunification services are likely to prevent continued abuse and neglect. [Citation.] Similarly, where the child is declared a dependent because of parental mental illness, the parent may *364 subsequently be evaluated to determine if the parent is incapable of utilizing reunification services. [Citations.]" (Id. at p. 201, 31 Cal.Rptr.2d 506.)
Thus, the court could not validly order a psychological evaluation until it found jurisdiction, and Mother's refusal to submit to an evaluation up to that point would not justify denying her services under the disentitlement doctrine. Now that the court has found jurisdiction and declared Minor a dependent, however, it has the authority to order an evaluation, and Mother's failure to comply with the order would provide a valid basis for denying services. Since Mother has not had an opportunity to consider whether to comply with a valid order for an evaluation, a remand is necessary to afford her that opportunity. The court on remand therefore should (1) determine whether an evaluation should be ordered; (2) if so, give Mother a reasonable opportunity to comply with the order; (3) if Mother submits to an evaluation, determine on the basis of the evaluation whether to afford or deny her reunification services under section 361.5(b)(2); and (4) if Mother refuses to submit, determine whether to deny her services based on her noncompliance with the court's order.
Mother argues that since she has not, at this point, refused to comply with a valid court order for an evaluation, it is premature for this court to decide what consequences should occur if the juvenile court makes such an order and she does refuse. In Baqleh v. Superior Court, supra, 100 Cal.App.4th 478, 122 Cal.Rptr.2d 673, the court faced an analogous situation. It held the trial court's order that the defendant submit to a psychological evaluation was procedurally defective and therefore invalid. Nonetheless, it went on to discuss what result should occur if the prosecution renewed its request for an evaluation, if the court granted the request, and if the defendant refused to submit. (Id. at p. 506,122 Cal.Rptr.2d 673.)
Here, similarly, it is appropriate to discuss the extent of the juvenile court's authority to deny reunification services based on Mother's noncooperation, even though it remains to be seen whether the court will order an evaluation and whether Mother will cooperate. Because the court thought it lacked the authority to deny services, it undoubtedly believed there was no point in ordering an evaluationMother would simply refuse, and the court would have to offer her services anyway. On remand, the court can decide whether to order an evaluation, this time with an accurate understanding of its authority. The fact the court might ultimately elect not to exercise its authority is not a good reason to refrain from deciding the issue.

III

DISPOSITION
The order of reunification services for Mother is reversed. The matter is remanded to the juvenile court for proceedings in accordance with this opinion.
We concur: HOLLENHORST, Acting P.J., and GAUT J.
NOTES
[1] We note in passing that subdivision (b)(6) of Welfare and Institutions Code section 361.5 provides that services may be denied where "the child has been adjudicated a dependent pursuant to any subdivision of Section 300 as a result of ... the infliction of severe physical harm to the child ... by a parent ... and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent. ..." The court in this case adjudicated Minor a dependent based in part on its finding that Minor suffered serious physical harm inflicted by Mother. However, the possibility of denying reunification services under section 361.5, subdivision (b)(6) was not addressed by the parties or the court, so we will express no opinion on the issue.
[2] Heller, Catch 22 (1961).