Filed 5/16/24  In re D.A. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re D.A. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>L.A.,<br><br>    Defendant and Appellant. | E081458<br><br>(Super.Ct.No. DPIN2200126)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Natalie M. Lough, Judge.

Affirmed.

Mansi Thakkar, under appointment by the Court of Appeal, for Defendant and Appellant.

Minh C. Tran, County Counsel, Teresa K.B. Beecham, and Prabhath Shettigar, Deputy County Counsel, for Plaintiff and Respondent.

1

In this dependency case, defendant and appellant L.A. (mother) challenges juvenile court orders (1) appointing a guardian ad litem to represent her interests over her objection, and (2) bypassing reunification services for her as to two children.[1] We affirm.

## I. BACKGROUND

In December 2022, plaintiff and respondent Riverside County Department of Public Social Services (department) filed a dependency petition regarding two of mother's children (born August 2010 and May 2012), alleging they came within Welfare and Institutions Code section 300, subdivisions (b) (failure to protect) and (g) (no provision for support).[2] The two children have different biological fathers, neither of whom was part of the household. The petition alleged domestic violence between mother and her current significant other, W.Y., as well as a "historical pattern of . . . domestic violence . . . in the presence of her children" based on mother's past relationship with the father of the children's older half-sibling. The petition also alleged unsafe and unsanitary physical conditions in the family's home, exacerbated by mother's use of "controlled and/or mind-altering substances . . . including but not limited to marijuana."

Initially, the department did not recommend the children be detained out of mother's care; at the time of its December 8, 2022 detention report, W.Y. was incarcerated on domestic violence charges from an incident with mother in November

---

[1] An older half-sibling to both the children in this case is no longer a minor (born November 2002). In 2018, that child's father was granted sole legal and physical custody of him.

[2] Undesignated statutory references are to the Welfare and Institutions Code.

2

2022. At the detention hearing about two weeks later, however, mother told the court that W.Y. had returned to the family home, and was caring for the children elsewhere in the courthouse during the hearing. Mother requested an opportunity to address the court, which was granted. Among other things, mother denied any domestic violence had occurred, either with W.Y. or in her previous relationship, and blamed the condition of her home on her landlord.

W.Y. was contacted by phone and instructed to return the children to the courtroom, which he did. The juvenile court ordered the children detained from mother, set her visitation at two supervised hours weekly, and ordered the department to provide her with services.

At the detention hearing, with some reluctance, mother accepted appointed counsel to represent her. Nevertheless, in the weeks following, mother personally filed a number of documents. Some of those filings included specific requests, such as returning the children to her care ("parent guardianship") or "another judge." In significant part, however—and in some cases exclusively—these documents also more generally communicated various concerns or views about the case, or attempted to submit "evidence." Some comments in these documents are simply implausible. For example, at one point she wrote the following about the detention hearing: "On 12/23/22 me my partner and children came to court. I tried showing my public defender my documentation and he didn't look at any of it so I asked who appointed him and if the courts did. He (public defender) said I would go to jail if he didn't represent me."

Before the jurisdiction and disposition hearing set for January 17, 2023, the department reported concern about mother's mental health. The department asked the court to sustain the allegations of the dependency petition, deny mother's request that the children be returned to her care, and continue the disposition hearing so mother could participate in two section 370 psychological evaluations to determine if she could benefit from services.

The department's concern about mother's mental health was triggered by her behavior. For example, when a new social worker first contacted mother a few days after the detention hearing, mother told the social worker that "her children were not removed from her and that she was looking for her children." The social worker "tried to inform her" of a scheduled visit with the children, and "she stated she had to get her car fixed in order to be able to go look for her children." The social worker tried to explain that the children were in a foster home, and to explain the social worker's role "in assisting her with arranging her visits, and interviewing her about what happened during the investigation." Mother repeatedly interrupted, refused to interview except "in front of a judge," and then placed the social worker on hold for an extended time. After the social worker hung up, mother called the sheriff's department to report "her children were in danger," giving the foster mother's name but an incorrect and apparently "random" address. When the social worker contacted mother again, mother "continued to make disconnected statements." Mother was "argumentative and did not allow [the social

4

worker] to speak," and "appeared to be confused and not be able to follow the conversation."

The social worker had another, similarly difficult conversation with mother a few days later. On a third occasion, when the social worker interviewed mother about the allegations of the dependency petition, mother interspersed her comments about the allegations with "disconnected references about various topics," and "appeared to escalate and deescalate her mood during the interview." Mother "would stand up and then sit down, during some of her interview," and at times she "would lean over the table to address [the social worker] directly and speak, pointing her finger." Mother raised her voice and her pupils "appeared dilated when she addressed the allegations."

Several times, mother called the department's Banning office, or directly called department employees other than the social worker. Those department employees, too, found mother's train of thought difficult to follow. Once, mother was "very agitated" about not receiving a response to her attempts to reach "a regional manager," and told the office assistant who answered her call the social worker was "'sleeping with her homeboys.'" The office assistant "ended the call, as [mother] was being very inappropriate." Mother called back and requested the social worker, the social worker's supervisor, and a regional manager sit in on her visit with the children that day.

At the jurisdiction and disposition hearing on January 17, 2023, mother initially indicated she wished to represent herself by giving her counsel an incomplete form "Petition To Proceed In Propria Persona," which he presented to the court. When the

court asked mother about her request, however, she asked to be appointed "someone to actually look at my case and talk to me about the case." Mother's further comments waver between expressing a lack of understanding that she had already been appointed counsel (perhaps related to a belief that she should be appointed a "public defender"), a lack of trust of appointed counsel, and a lack of opportunity to speak with her appointed counsel. She said she did not understand why the children had been taken from her care, and she had never seen any of the department's reports. She then said she would like to "hire [her] own attorney." The court ordered appointed counsel to continue representing mother until she has "privately retained counsel," and ordered the department to provide mother with copies of its reports. But when someone (apparently the department's attorney, though the record is not clear) tried to hand mother a copy of the department's report, she refused to accept it: "He's talking about a domestic violence case. He's going against him. I'm not going to sit here and go against my own partner."

At that point, mother's counsel requested jurisdictional and dispositional matters be set for a contested hearing, and continued: "I'm sorry, Your Honor. I think I have to declare a doubt." The court clarified that counsel was asking the court to appoint a guardian ad litem for mother. Minors' counsel also requested a pre-jurisdiction psychological evaluation of mother, expressing concern about her "ability to assist rationally in her defense."

The court stated it would "conduct[] an informal hearing at this time as to whether or not a guardian ad litem is necessary," and asked mother's counsel to "state on the

6

record why you believe a guardian ad litem should be appointed on behalf of your client." Counsel responded: "Well, it's essentially, Your Honor, I don't believe she can rationally assist with her defense. I have tried to meet with her. I have spoken with her about her case. I'm not sure if—I'm not sure what's going on.[¶] She essentially is saying things that—so for instance, that I told her that she needed to accept my representation or she would go to jail. She's told me that multiple times. Just when I tried to talk to her about the allegations, the conversation doesn't get very far. I can't have a conversation with her to discuss this case. So I have tried with her, and I just have not been successful. I'm not sure what else to do."

The court explained to mother the purpose of a guardian ad litem, why her attorney believed one was necessary, and what one could do to help her in the litigation. It then asked her if she would agree to the appointment. Mother declined; her apparently non-verbal response was observed for the record by the trial court ("Yes or no? All right. I'll take that as a no.") The court then appointed a guardian ad litem over mother's objection, finding she "qualifies for incompetency in terms of inability to assist counsel in representing her." The court appointed a psychologist, William H. Jones, to evaluate mother and provide a report to the court, and directed mother to cooperate with that evaluation. It cautioned that if mother "does not cooperate with that evaluation, that will be deemed willful failure to comply with Court order and will be used against her under [section 361.5, subd. (b)(2)]."

7

Jones evaluated mother on February 1, 2023, and submitted a report to the juvenile court later that month. Jones "did not see evidence of any significant cognitive impairment" during his interview with mother, observing she "did appear to understand to a basic extent how the legal proceedings worked and how they applied to her and her children." He "did not see any impairment in her ability to cooperate with her attorney," and stated, "there was no indication of a need for a [guardian ad litem]." He observed, however, that mother exhibited "rather extreme denial of problem areas, guardedness, [and] a tendency to blame others for her problems," concluding "she may not benefit very much from interventions within a reasonable period of time and may have difficulty in improving her parenting."

At the jurisdiction and disposition hearing on March 1, 2023, mother's counsel had not yet had an opportunity to review Jones's report, and counsel specially appearing for the guardian ad litem had not received the report at all. Also, the department had filed a "lengthy" addendum report the day before. Mother's counsel, with the agreement of the other parties, therefore requested a continuance. He noted mother herself had "information" she wanted to "present to the court," and that she was "not in favor of the continuance." Counsel for the guardian ad litem also informed the court of mother's desire to "make a statement," but agreed with mother's counsel's request that "all comments be reserved" until the continued hearing. The department requested an order that mother's visitation be "with mother only" and that W.Y. not be allowed to be present. Counsel for the guardian ad litem interposed an objection to that request on

8

mother's behalf, but stated the guardian ad litem "understands the Department's concern."

During the hearing, mother became disruptive; the court observed her "laughing and rolling [her] eyes and mocking people while they are speaking." Mother did not comply with the court's direction that she "comport [herself] with respect for the Court and all parties here," and was removed from the courtroom. The court continued the jurisdiction and disposition hearing and ordered the children's "visitation with mother only be with mother and no other third parties allowed to be present including and specifying [W.Y.]."

In an addendum report submitted before the continued hearing, the department recommended mother be ordered to submit to a second psychological evaluation, and that disposition matters be continued to allow her time to do so. It also recommended mother's visitation be suspended as detrimental to the children. Sometimes, she would appear "loving, caring and supportive for her children," but at other times, she demonstrated a "lack of capacity to appropriately ensure her children are safe, and appropriately cared for." Repeatedly, mother tried to have W.Y. participate in visits. When she did not get her way, on that or other issues, she would call the police to come to the department office. During visits, the children "witnessed the mother yelling and cursing at the caregivers, staff and law enforcement officers." The children would try "to intervene, deescalate their mother, and prevent her from calling law enforcement," but they were not always successful. Once, in March 2023, mother was "physically removed

from the office" by police after she "screamed" at one officer and "raised her hand" to another. The next week, mother "became emotionally and verbally abusive" to the younger child, demanding that he "speak to her about his school activities."[3] She "pinned" the child to a chair, holding him down by the hands, and began to "scream" at him, refusing to respond to social workers trying to intervene. Law enforcement "had to respond to the office to get the mother off the child." The child was "visibly upset and took almost an hour to calm down."

The department again expressed "concern[] for the mother possibly having untreated mental health history that puts the children's health, safety and well-being at risk." At times, mother would "make[] a statement, and then will make the opposite statement minutes later." At times, she appeared "not able to focus during interactions with her," and would "talk[] on tangents that do not appear to be connected or related to each other." She behaved erratically, made repetitive statements, and her moods would "change drastically in a short time span." The department emphasized Jones's opinion that mother "is unlikely to benefit from interventions (domestic violence, parenting, or counseling) due to her extreme denial of her problem areas, guardedness, and her tendency to blame others for her problems." And, indeed, mother had not enrolled in any services.

---

[3] In February 2023, Mother's educational rights as to the younger child were temporarily limited under section 319, subdivision (j), after she opposed him receiving an individualized education program (IEP) to address "an emotional disturbance and a specific learning disability."

On April 3, 2023, the court held the contested jurisdictional hearing. Mother's counsel and the guardian ad litem both objected to all the jurisdictional allegations on mother's behalf, and mother's counsel argued specifically that there was insufficient evidence to sustain the allegation about substance abuse. Mother's counsel objected to the department's recommendation that visitation be suspended. The guardian ad litem represented mother's wishes as follows: "She would like to reunite with her children as soon as possible. I tried talking to her about visitation, but she did not want to speak about that. . . . I know that last time she asked for return of the children, and I am asking [for what] she would ask for today. But I have spoken with the mother, and we are requesting the Court find allegations not true and place the children with the mother."

The court struck three of the allegations of the dependency petition; the one relating to substance abuse by mother, as well as two involving only the younger child's father. It found the remaining allegations true and took jurisdiction over both children. The court ordered mother to undergo a second psychological evaluation and suspended her visitation, finding detriment to the children by clear and convincing evidence. The court also ordered the younger child to be evaluated by the same psychologist as mother, Kenneth Garrett. Mother, through counsel, objected to the psychological evaluation of the younger child; the trial court overruled the objection.

On April 6, 2023, mother, acting on her own behalf, filed a section 388 petition and supporting documents, again requesting the children be returned to her care. The court granted mother a hearing on the petition, which was later moved to coincide with

11

the disposition hearing. On April 14, 2023, again acting on her own behalf, mother filed a handwritten "declaration" accompanied by nearly 200 pages of "exhibits," consisting largely of case documents with handwritten commentary added.

On April 12, 2023, Garrett completed an evaluation of the younger child, who had been "manifest[ing] significant behavioral problems" in his foster home and had "multiple suspensions from school because of severe outburst[s]." Garrett concluded the child's behavior was "indicative of observing a great deal of agitation and violence and now he has socially learned to deal with his anxiety in that manner." He found the child was not "intellectually impaired," though he was "somewhat behind academically." Garrett found it "clear that visitations with his mother were highly disruptive for him and his behavior was severely agitated." The child's "primary need[]" was "stabilization," which he was experiencing in his foster home.

Garrett was unable to perform a psychological evaluation of mother, as he explained in an April 14, 2023, letter to the court. Garrett described mother's behavior on the phone before her appointment as "agitated, hostile, and uncooperative." She arrived at the appointment, accompanied by W.Y., and continued in a similar manner. She refused to sign the intake form, which Garrett described as "essentially a consent form which gives me permission to mail my report to the Department." When Garrett asked her to "please do so she stated that [Garrett] couldn't force her to do anything." Garrett told her cooperation was needed to complete the evaluation, and if she did not cooperate she would "have to leave," "at which point she called 911." Based on mother's

behavior on the phone, he had "assumed she would behave improperly," so he had arranged to have a second person present to help, and Garrett and his secretary were able to "usher[] [mother] out although she was resistant to leave the waiting room." Garrett noted he had reviewed the court records, which showed "these types of outbursts, calling 911, and being uncooperative and hostile are indicative of [mother's] format in dealing with the removal of her children." Garrett stated that he "will not see [mother] again" because of her behavior. Garrett's "impression" was that the younger child had "modeled" some of mother's behavior, and would need "a great deal of help learning to control it." Garrett concluded: "Clearly, with the behaviors that I noted today and [mother's] conduct on the phone as well as the condition her son is in, I believe that providing services at this time will be useless as she would not benefit from them."

On May 23, 2023, the court held the disposition hearing. The department recommended the court bypass reunification services for mother under section 361.5, subdivision (b)(2), based on the "reports from Dr. Jones and Dr. Garrett." The department also argued "the disentitlement doctrine" applied because mother "refused to sit somewhat for the psych eval with Dr. Garrett." Mother's counsel objected to bypass of mother's reunification services, under either section 361.5, subdivision (b)(2) or the disentitlement doctrine. The guardian ad litem told the court: "Mother believes she's entitled to services, and I would ask the Court to not follow the [department's] recommendation and grant her services. She does want to be a mother to her children."

The court adopted the department's recommendation to bypass reunification services for mother. The court noted that the "statutory requirement for two evaluations to support . . . bypass" under section 361.5, subdivision (b)(2) "are not present." It cited *In re C.C.* (2003) 11 Cal.App.4th 76 for the proposition that "under the doctrine of disentitlement, mother is not entitled to services and/or the (b)(2) bypass provisions apply."

## II. DISCUSSION

In mother's view, "all orders rendered after the [guardian ad litem] appointment must be reversed." She also asks us to reverse the decision to bypass her reunification services, even if we affirm the guardian ad litem's appointment. We address these arguments separately, rejecting both.

### A. *Guardian Ad Litem*

Mother argues the appointment of a guardian ad litem was unsupported by substantial evidence and violated her right to procedural due process. We are not persuaded.

"In a dependency case, a parent who is mentally incompetent must appear by a guardian ad litem appointed by the court." (*In re James F.* (2008) 42 Cal.4th 901, 910 (*James F.*).) "The test is whether the parent has the capacity to understand the nature or consequences of the proceeding and to assist counsel in preparing the case." (*Ibid.*) "Stated another way, '[a] person may be found incompetent if the person was either

incapable of understanding the nature and purpose of the proceeding *or* unable to assist counsel in a rational manner.'" (*In re Samuel A.* (2021) 69 Cal.App.5th 67, 78.)

"Before appointing a guardian ad litem for a parent in a dependency proceeding, the juvenile court must hold an informal hearing at which the parent has an opportunity to be heard. [Citation.] The court or counsel should explain to the parent the purpose of the guardian ad litem and the grounds for believing that the parent is mentally incompetent. [Citation.] If the parent consents to the appointment, the parent's due process rights are satisfied. [Citation.] A parent who does not consent must be given an opportunity to persuade the court that appointment of a guardian ad litem is not required, and the juvenile court should make an inquiry sufficient to satisfy itself that the parent is, or is not, competent." (*In re James F.*, *supra*, 42 Cal.4th at pp. 910-911; accord, *In re Jessica G.* (2001) 93 Cal.App.4th 1180, 1186.)

"If the court appoints a guardian ad litem without the parent's consent, the record must contain substantial evidence of the parent's incompetence." (*In re James F.*, *supra*, 42 Cal.4th at p. 911.) In reviewing for substantial evidence, we accept all evidence supporting the juvenile court's order, completely disregard contrary evidence, and draw all reasonable inferences from the evidence to support the judgment or finding. (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 581-582 (*Schmidt*).) Our function is to determine only if substantial evidence supports the juvenile court's order and *not* whether substantial evidence may have supported a contrary order. (*Id.* at p. 582.)

Mother asserts the trial court failed to sufficiently inquire into her competence because it "relied solely on conclusory statements from [her] counsel and minors' counsel." The evidence before the court, however, was not in fact so limited. In reports, the social worker did not just make "conclusory statements" about mother's mental competence but described her behavior, from which the court could make its own inferences. For example, in a conversation a few days *after* the detention hearing, mother told the social worker that "her children were not removed from her and that she was looking for her children." The social worker "tried to inform her" of a scheduled visit with the children, and mother "stated she had to get her car fixed in order to be able to go look for her children." Mother then called law enforcement to report "her children were in danger." This is evidence mother did not understand the nature or consequences of the dependency proceedings. So too, arguably, were her comments at the January 17, 2023 hearing, expressing that she did not understand why the children had been taken from her.

There was also substantial evidence mother could not assist counsel in a rational manner. "[A]n attorney-client relationship requires the defendant to have 'an ability to discuss the facts of a case with counsel "without paranoid distrust,"' a capacity 'to advise and accept advice from counsel,' and 'an ability to consult rationally about a pending case which is something more than a superficial capacity to converse with others.'" (*In re M.P.* (2013) 217 Cal.App.4th 441, 454.) Record evidence supports the conclusion that mother could do none of these things. At the January 17, 2023 hearing, mother requested the court appoint counsel for her, seeming at first not to understand that had been done,

16

and then expressing paranoid distrust for appointed counsel. Her attorney stated he had tried to talk with her about the case but the "conversation doesn't get very far." The attorney could not dissuade mother from the belief he had told her she needed to accept his representation or she would go to jail. On appeal, mother invokes the principle that "'the unsworn statements of counsel are not evidence.'" But even assuming that principle applies here—a questionable proposition—mother also expressed that same belief in written form, in a "declaration" she filed with the court. It was reasonable for the trial court to conclude on this record mother was unable to assist counsel in a rational manner.

We disagree with mother's argument that Jones's assessment of her, finding no need for a guardian ad litem, "is the most dispositive factor" in determining whether substantial evidence supported the decision to appoint a guardian ad litem. The argument fails for at least three reasons. First, mother misunderstands the standard of review. Evidence supporting one conclusion, even strong evidence, does not negate substantial evidence for a contrary conclusion. (*Schmidt*, *supra*, 44 Cal.App.5th at pp. 581-582.) Second, the argument relies on anachronism; Jones did not make his evaluation until after the decision to appoint the guardian ad litem had been made.[4] Third, Jones's evaluation was based on limited data, consisting of only his interview with mother and his review of

---

[4] In passing, mother notes the court did not reconsider its decision to appoint a guardian ad litem after Jones's report, suggesting it should have. She does not, however, develop an argument that it was error to fail to reconsider the appointment sua sponte, and neither mother, nor mother's appointed attorney, nor her guardian ad litem requested reconsideration. We therefore do not discuss that issue further.

17

two department reports. He was unaware of the documents mother filed, her statements and other behavior at the January 17, 2023 hearing, or her attorney's comments at that hearing. Thus, the court reasonably could have discounted the evidentiary value of Jones's opinion on mother's competency.

Mother is incorrect that *In re Samuel A.*, *supra*, 69 Cal.App.5th at p. 67 requires that we find the evidence inadequate. In that case, the juvenile court found a parent *was not* mentally incompetent, but rather engaged in a "knowing and deliberate effort to obstruct proceedings she believed were not going to be favorable to her." (*Id.* at p. 77.) The court of appeal held that the juvenile court may not "appoint a guardian ad litem as a response to a legally competent, albeit exceedingly difficult, parent." (*Id.* at p. 85.) That holding has no application here, since the juvenile court found mother *was* mentally incompetent because she was unable to assist her counsel in a rational manner, and that finding was supported by substantial evidence.

Because we find no error in the juvenile court's decision to appoint a guardian ad litem, we need not and do not address the parties' arguments about prejudice.

B. *Bypass of Reunification Services*

Mother argues the juvenile court erred by bypassing reunification services for her under either the disentitlement doctrine or section 361.5, subdivision (b)(2). We agree with mother that section 361.5, subdivision (b)(2) does not apply. We find no abuse of discretion, however, in the juvenile court's application of the disentitlement doctrine.

18

1. *Section 361.5, subdivision (b)(2).*

Dependency cases carry a presumption that parents will receive family reunification services.  (§ 361.5, subd. (a).)  The presumption "implements the law's strong preference for maintaining the family relationship if at all possible."  (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 474; see § 202, subd. (a) ["reunification of the minor with his or her family shall be a primary objective"].)  Nevertheless, "in certain situations, attempts to facilitate reunification do not serve and protect the child's interests."  (*In re Baby Boy H.*, *supra*, at p. 474.)  Statutes authorizing the denial of reunification services are often called "bypass" provisions.  (*In re T.G.* (2015) 242 Cal.App.4th 976, 989.)

The bypass provision in section 361.5, subdivision (b)(2), is known as the mental disability exception.  Its application draws upon not only the subdivision itself but also section 361.5, subdivision (c)(1), and Family Code section 7827.

Reunification services need not be provided if the court finds by clear and convincing evidence from any two experts "'that a parent or parents suffer a mental incapacity or disorder that renders the parent or parents unable to care for and control the child adequately.'"  (*Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, 880, quoting Fam. Code, § 7827, disapproved on other grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7; see section 361.5, subd. (b) [requiring clear and convincing evidence]; Fam. Code, § 7827, subd. (c) [requiring "the evidence of any two experts" to support a mental disability finding].)  Additionally, section 361.5, subdivision (b)(2),

19

requires a finding that the mental disability "renders the parent or guardian incapable of utilizing those services." "Subdivision (c) of section 361.5 speaks to the proof required under subdivision (b)(2) and provides in relevant part: 'When it is alleged . . . that the parent is incapable of utilizing services due to mental disability, the court shall order reunification services unless competent evidence from mental health professionals establishes that, even with the provision of services, the parent is unlikely to be capable of adequately caring for the child.'" (*In re Joy M.* (2002) 99 Cal.App.4th 11, 17.)

Here, two experts opined that mother is unlikely to benefit from services. Jones found mother's "rather extreme denial of problem areas, guardedness, [and] a tendency to blame others for her problems" meant "she may not benefit very much from interventions within a reasonable period of time and may have difficulty in improving her parenting." Garrett made a similar point using stronger language, concluding from her behavior on the phone and in person "that providing services at this time will be useless as she would not benefit from them."

Neither Jones nor Garrett, however, opined that mother suffers from any mental incapacity or disorder, let alone a "mental incapacity or disorder that renders [her] unable to care for and control the [children] adequately." (Fam. Code, § 7827, subd. (a).) Jones "did not see evidence of any significant cognitive impairment," and found "no indications that she was mentally incompetent." Garrett was unable to perform any psychological evaluation because of mother's uncooperative and hostile behavior. In the absence of even one expert opinion, let alone two, that mother suffers from a mental incapacity or

disorder that renders her unable to care for and control the children adequately, the bypass provision of section 361.5, subdivision (b)(2) cannot apply here.

The department's argument that *Curtis F. v. Superior Court* (2000) 80 Cal.App.4th 470 (*Curtis F.*) supports a different conclusion is mistaken. In that case, two experts expressly or implicitly agreed a parent had a mental disability, but their "conclusions about [the parent's] prospects were not identical." (*Id.* at p. 474.) *Curtis F.* held there is "no requirement that both experts must agree a parent is unlikely to benefit from services." (*Ibid.*) "Instead, the statute requires a showing only of evidence proffered by both experts regarding a parent's mental disability, evidence from which the court then can make inferences and base its findings." (*Ibid*.) In our case, *neither* expert provided evidence that mother has a mental disability; Jones did not find her to have one, and Garrett had no chance to evaluate her. The only conclusion that follows from our facts, under *Curtis F.* as well as the other authority we have discussed, is that the requirements of section 361.5, subdivision (b), were not satisfied, no matter how unlikely it is mother will benefit from services.

2. *Disentitlement doctrine.*

Disentitlement is an equitable doctrine that forbids a party from seeking the assistance of the court when that party is in contempt of a court order bearing directly on the assistance being sought. (See *In re Claudia S.* (2005) 131 Cal.App.4th 236, 244, quoting *MacPherson v. MacPherson* (1939) 13 Cal.2d 271, 277.) It "is not a jurisdictional doctrine, but a discretionary tool that may be applied when the balance of

21

the equitable concerns make it a proper sanction." (*People v. Puluc-Sique* (2010) 182 Cal.App.4th 894, 897 (*Puluc-Sique*).)

Disentitlement can be invoked by an appellate court as a basis for dismissing an appeal. (E.g., *Macpherson v. Macpherson*, *supra*, 13 Cal.2d at p. 277 [while appealing an award of attorney fees and costs in a divorce case, father took the children to Mexico in violation of "the very order from which he seeks relief" on appeal]; see also *Puluc-Sique*, *supra*, 182 Cal.App.4th at p. 898 ["Appellate disentitlement is, fundamentally, a doctrine based on forfeiture"].) It also can be applied by a trial court in the first instance, as the juvenile court did here. (E.g., *Adoption of Jacob C.* (1994) 25 Cal.App.4th 617, 623 [trial court barred mother from participating, through counsel, in hearing on petition to terminate her parental rights as to one child because she absconded with a second child and remained in hiding]; *In re Marriage of Cohen* (2023) 89 Cal.App.5th 574, 583 [trial court dismissed request for order to reduce spousal support payments for intentional failure to comply with support orders].)

We review the juvenile court's application of the disentitlement doctrine for abuse of discretion. (*In re Marriage of Cohen*, *supra*, 89 Cal.App.5th at p. 583.) "'''An abuse of discretion occurs when, in light of applicable law and considering all relevant circumstances, the court's ruling exceeds the bounds of reason.'''" (*Ibid.*) Nevertheless, judicial discretion must be "'guided and controlled by fixed legal principles, to be exercised in conformity with the spirit of the law, and in a manner to subserve and not to impede or defeat the ends of substantial justice.'" (*People v. Superior Court (Alvarez)*

22

(1997) 14 Cal.4th 968, 977.)  Here, we must take into account the principle that disentitlement is reserved as a rarely imposed consequence for "egregious" conduct.  (*In re Baby Boy M.* (2006) 141 Cal.App.4th 588, 597, fn. 6; see also *In re E.M.* (2012) 204 Cal.App.4th 467, 477 ["Not every act of noncooperation in the trial court results in disentitlement"].)  Our review is "'deferential'" but "'not empty.'"  (*People v. Giordano* (2007) 42 Cal.4th 644, 663.)

The juvenile court here relied on this court's opinion in *In re C.C.* (2003) 111 Cal.App.4th 76 as authority for applying the disentitlement doctrine to bypass reunification services for mother.  In that case, before the jurisdiction and disposition hearing, the mother had "continuously refused to submit" to psychological examination.  (*In re C.C.*, *supra*, 111 Cal.App.4th at p. 82.)  Thus, the record did not include evidence from two experts about whether she had a mental disability rendering her "incapable of utilizing reunification services" within the meaning of section 361.5, subdivision (b)(2).  The juvenile court granted reunification services to the mother, believing it "was bound to offer services" to her, even though there was some evidence "suggesting denial of services under [section 361.5, subdivision (b)(2)] might be shown to be appropriate if a psychological evaluation were obtained."  (*In re C.C.*, at p. 84.)

The minor appealed, and the court of appeal reversed, finding the disentitlement doctrine gave the juvenile court an option it had not considered.  (*In re C.C.*, *supra*, 111 Cal.App.4th at p. 84.)  In dependency cases, disentitlement had been previously applied when a party had "absconded" with a child.  (*Ibid.*)  Authority from other contexts

showed, however, disentitlement also could apply "to other kinds of conduct," and "[i]n particular . . . conduct that, as in this case, frustrates the ability of another party to obtain information it needs to protect its own legal rights." (*Id.* at p. 85.) Refusing to submit to psychological evaluation made it "impossible for the court to perform its obligation to determine . . . whether [the mother's] mental disability renders her incapable of utilizing reunification services." (*Ibid.*) It also interfered with the minor's right to "proceed to the permanency planning stage without the delay of 12 months or more that must be afforded if reunification services are provided to [the mother]." (*Ibid.*) The court of appeal found application of the disentitlement doctrine "particularly appropriate in the context of reunification services," as "'[r]eunification services are a benefit, and there is no constitutional "entitlement" to these services.'" (*Ibid.*) And it interpreted section 361.5, subdivision (b)(2)'s requirement of two psychological evaluations to "assume[] a cooperative parent who will submit to the evaluations," declining to give the statutory language a "literal meaning" that would preclude applying disentitlement as "a recognized nonstatutory doctrine of law." (*In re C.C.*, at pp. 85, 90.)

The psychological evaluations the mother in *In re C.C.* had refused were *authorized* prejurisdiction, but had not been *ordered*. (*In re C.C.*, *supra*, 111 Cal.App.4th at p. 91 ["[A] court has no authority to order a psychological evaluation of a parent until it has exercised dependency jurisdiction]; see *Laurie S. v. Superior Court* (1994) 26 Cal.App.4th 195, 201-203.) After that, however, the juvenile court had sustained the jurisdictional allegations of the dependency petition, "including the allegation that

24

Mother suffered from mental health problems that endangered Minor's safety and well-being." (*In re C.C.*, at p. 82.) The court of appeal therefore remanded the matter for the juvenile court to "(1) determine whether an evaluation should be ordered; (2) if so, give Mother a reasonable opportunity to comply with the order; (3) if Mother submits to an evaluation, determine on the basis of the evaluation whether to afford or deny her reunification services under section 361.5(b)(2); and (4) if Mother refuses to submit, determine whether to deny her services based on her noncompliance with the court's order." (*Id.* at p. 91.)

This court's more recent opinion in *In re E.E.* (2020) 49 Cal.App.5th 195, declined to follow *In re C.C.*'s discussion of the disentitlement doctrine as dicta. (*In re E.E.*, at p. 210.) *In re E.E.* also "question[ed]" the "appropriateness" of "broad" language in *In re C.C.*, "staking out the position that where 'the parent is not cooperative, a court has the inherent power under the disentitlement doctrine to bar that parent from seeking further assistance from the court, including the provision of reunification services.'" (*In re E.E.*, at p. 211, 210, quoting *In re C.C.*, *supra*, 111 Cal.App.4th at p. 85.) *In re E.E.* "doubt[ed] the discretionary doctrine creates a sweeping power to deny reunification services in view of the Legislature's clear preference for keeping families together at the disposition stage." (*In re E.E.*, at p. 211.)

*In re E.E.*'s point that the disentitlement doctrine should not be applied to bypass reunification services in a "sweeping" manner is well taken. (*In re E.E.*, *supra*, 49 Cal.App.5th at p. 211.) In any context, disentitlement "is a discretionary doctrine that

25

must be applied in a manner that takes into account the equities of the individual case."
(*Puluc-Sique*, *supra*, 182 Cal.App.4th at p. 901.)  At the disposition stage of a
dependency, the equities usually weigh strongly in favor of granting reunification
services, since "the interest at stake for a parent is 'enormous'" and reunification services
"""implement 'the law's strong preference for maintaining the family relationships if at
all possible.'""" (*In re E.E.*, at pp. 207, 211).  Thus, it is appropriate that disentitlement
doctrine be applied sparingly, as those strong factors will only rarely be outweighed by
other considerations.

We turn, then, to whether the juvenile court abused its discretion here by applying
disentitlement to bypass mother's services in light of mother's refusal to undergo the
psychological evaluations necessary to make a determination under section 361.5,
subdivision (b)(2), keeping in mind that disentitlement doctrine should be applied
sparingly and only in cases of egregious conduct.

Mother does not challenge the application of the disentitlement doctrine, in
general, where a parent's refusal to submit to a psychological evaluation has prevented
gathering evidence as to whether the parent has a mental disability.  On the contrary, she
concedes that if the court had given mother "another opportunity to comply with the
second evaluation," and she still did not comply, "the court may have been justified in
applying disentitlement."  Instead, she argues the court failed to give her a reasonable
opportunity to comply with its orders, by failing to grant her another chance to participate

26

in that second evaluation. Addressing the argument mother has raised, we find no abuse of discretion.

First, the evaluation by Garrett that mother refused to undergo was not just authorized, but validly ordered by the juvenile court. Once the juvenile court took jurisdiction over the children, it had the authority to require mother to undergo psychological evaluation. (*In re C.C.*, *supra*, 111 Cal.App.4th at p. 91, *Laurie S.*, *supra*, 26 Cal.App.4th at pp. 201-203.) Mother's refusal to cooperate violated that order.

Second, the juvenile court had reason to believe mother may have a mental disability that would bring her within section 361.5, subdivision (b)(2). Where there is no reason to believe a parent may have a mental disability, a parent's failure to submit to a court-ordered psychological evaluation is simply a failure to comply with the case plan.[5] That is not the case here.

Third, mother did indeed refuse to undergo the court-ordered evaluation. In briefing, she tries to reframe the issue: "Mother did in fact attend the evaluation with Dr. Garrett, however, Dr. Garrett chose not to complete the evaluation because Mother refused to sign consents authorizing him to release the evaluation to the Department." Mother was ordered to meet with a psychologist not for her own therapeutic treatment,

---

[5] Even in the absence of evidence of psychological problems rising to the level of mental disability, psychological evaluation may be properly ordered, for example, to assist the court and the department in tailoring services to address the family's needs. (See, e.g., *In re Dino E.* (1992) 6 Cal.App.4th 1768, 1777 [reunification plan must be "specifically tailored to fit the circumstances of each family" and "designed to eliminate those conditions which led to the juvenile court's jurisdictional finding"].)

27

but specifically to produce an evaluation to be used by the court and the department to determine how to proceed in the dependency. A refusal to allow the psychologist to release the evaluation is functionally the same as refusal to undergo evaluation at all, and the juvenile court properly treated it as such.

Finally, mother's behavior in refusing to undergo evaluation by Garrett went beyond mere lack of cooperation. If mother had done no more than miss an appointment, her argument that she was not given a reasonable opportunity to comply with the court's order might have more force. Instead, her agitation and hostility even on the telephone was such that the psychologist felt unsafe meeting with her alone, and her continuation of such behavior at his office caused him to refuse to meet with her again. And that behavior was not an aberration, but reflected a repeated pattern observed by social workers, law enforcement officers, and the court itself.

We are not persuaded mother was denied a reasonable opportunity to comply with the court's order that she submit to a second psychological evaluation. On that basis, we conclude mother has not demonstrated any abuse of the trial court's discretion.

## III. DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL
                                                                    J.

We concur:

MILLER
          Acting P. J.

MENETREZ
                    J.

29